[No. H002349. Sixth Dist. Apr. 12, 1988.]

Conservatorship of the Person of WILLIAM J. DRABICK III.
DAVID DRABICK, Petitioner and Appellant, v.
WILLIAM J. DRABICK III, Objector and Respondent.

COUNSEL

Michael Gilfix and Myra Gerson Gilfix for Petitioner and Appellant.

Fenella Rouse, Elena N. Cohen, Richard Wasserman and Paige Wickland as Amici Curiae on behalf of Petitioner and Appellant.

Frank O. Bell, Jr., and Harvey R. Zall, State Public Defenders, under appointment by the Court of Appeal, and Michael Pescetta, Deputy State Public Defender, for Objector and Respondent.

**OPINION**

## I. INTRODUCTION

**AGLIANO, P. J.**—Petitioner David Drabick is conservator of the person of his brother William J. Drabick III, who has been comatose in a persistent vegetative state since 1983 and maintained with a nasogastric feeding tube. Citing his brother's best interests, David Drabick sought the approval of the superior court of Santa Clara County for removal of the tube. The superior court denied the petition, and the conservator appeals.

David Drabick contends that California law authorizes the conservator of an incompetent person in a vegetative state with no hope of recovery to decide, considering medical advice and the conservatee's best interests, that medical treatment in the form of artificial life support should be withdrawn and the conservatee permitted a natural death. We agree and thus reverse the superior court's decision with directions to reconsider the petition in light of the principles set forth below. Our view is in essential accord with that of all other states which have confronted the question.[1]

---

[1] The courts of twelve states, including the highest courts of ten, have approved decisions to forego life-sustaining treatment for permanently comatose patients. All decisions to the contrary appear to have been reversed by higher courts.

Arizona: *Rasmussen by Mitchell* v. *Fleming* (1987) 154 Ariz. 207 [741 P.2d 674] (*Rasmussen*);

Connecticut: *Foody* v. *Manchester Memorial Hosp.* (1984) 40 Conn. Supp. 127 [482 A.2d 713];

Delaware: *Severns* v. *Wilmington Medical Center, Inc.* (Del.Super. 1980) 421 A.2d 1334 (answering certified question); *In re Severns* (Del.Ch. 1980) 425 A.2d 156 (granting relief);

Florida: *John F. Kennedy Hosp.* v. *Bludworth* (Fla. 1984) 452 So.2d 921; *In re Guardianship of Barry* (Fla.App. 1984) 445 So.2d 365;

Georgia: *In re L.H.R.* (1984) 253 Ga. 439 [321 S.E.2d 716];

Maine: *In re Gardner* (Me. 1987) 534 A.2d 947;

Massachusetts: *Brophy* v. *New England Sinai Hosp., Inc.* (1986) 398 Mass. 417 [497 N.E.2d 626];

Minnesota: *Matter of Conservatorship of Torres* (Minn. 1984) 357 N.W.2d 332;

New Jersey: *Matter of Jobes* (1987) 108 N.J. 394 [529 A.2d 434]; *Matter of Peter by Johanning* (1987) 108 N.J. 365 [529 A.2d 419]; *Matter of Quinlan* (1976) 70 N.J. 10 [355 A.2d 647];

New York: *Matter of Storar* and *Eichner* v. *Dillon* (companion cases) (1981) 52 N.Y.2d 363 [438 N.Y.S.2d 266, 420 N.E.2d 64]; *Delio* v. *Westchester County Med. Center* (1987) 129 App.Div.2d 1 [516 N.Y.S.2d 677];

## II. Background

### A. *William Drabick*

On February 5, 1983, William Drabick received a severe head injury in an automobile accident. In emergency care, physicians diagnosed and evacuated a subdural hematoma and introduced nasogastric feeding but were not able to return William to consciousness.

William is now 44 years old. He has four adult brothers: David, Thomas, Kirke, and Fredrick Drabick. His parents are deceased. He was married in November 1968, divorced in August 1969, and has no children. At the time of the automobile accident, William had lived for approximately 12 years with Jeannine Crincic Gonzalez.

William is now in a nursing home. In the five years since the accident he has remained unconscious in a persistent vegetative state, or coma. Because his electroencephalogram is not flat he is not "brain dead." Moreover, he breathes without the assistance of a respirator. For these two reasons, California law considers him to be alive.[2] However, he is unconscious, his eyes remain closed, and he is not capable of voluntary movement. He does not communicate or respond to sound or physical stimulation. He does not usually respond to painful stimuli. When he does respond it is only with a nonspecific tremor. William is totally unable to care for himself or to sustain his own life. He cannot eat but is given nourishment and water through a nasogastric tube.

Three physicians have examined William. His primary physician, Dr. Klee, stated in a declaration that, "[b]ased on history to date and reasonable expectations of the future, I believe that Mr. Drabick is permanently comatose. . . . He has no rehabilitation potential." Two neurologists, Drs. Laster and Likosky, have also examined William and come to essentially the same conclusion. Based on all of the information available about William's medical condition, Dr. Klee does not believe that he "may again communicate and have any kind of a sentient, thinking existence" and does not feel that there is "any realistic hope for recovery in any way." Dr. Klee has

---

Ohio: *Leach* v. *Akron General Medical Center* (1980) 68 Ohio Misc. 1 [22 Ohio Ops.3d 49, 426 N.E.2d 809];

Washington: *In re Guardianship of Grant* (1987) 109 Wn.2d 545 [747 P.2d 445]; *Matter of Welfare of Colyer* (1983) 99 Wn.2d 114 [660 P.2d 738].

[2] California has adopted the Uniform Determination of Death Act as Health & Safety Code section 7180. Subdivision (a) of this statute provides: "An individual who has sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead. A determination of death must be made in accordance with accepted medical standards."

stated that she would be willing to remove or direct the removal of William's nasogastric tube if the court approves the conservator's decision.

## B.  *The Conservatorship Proceedings*

On September 26, 1985, the superior court appointed David Drabick successor conservator of the person of William, his brother. Pursuant to Probate Code section 2355, subdivision (a), the court found that William lacked capacity to give informed consent to medical treatment. Granting a specific request of the conservator, the court ordered "that cardiopulmonary resuscitation and electrical cardioversion may be withheld in the event the conservatee suffers a cardiac arrest or any similar medical emergency requiring such treatment." The court also authorized the conservator "to consent to a medical order directing that such treatment be withheld." This earlier order is not before us on appeal.

On December 30, 1985, after William had been comatose for two years and ten months, the conservator petitioned the superior court for a further order "authorizing the withholding of medical treatment, to wit, the permanent removal of nasogastric tubes and the withholding of any other medical procedure or treatments utilized to deliver nutrition and hydration to a patient in the conservatee's condition." No one opposed the conservator's petition. Each of William's four adult brothers submitted a declaration expressing his belief that William "would not view his present state as a meaningful or as an acceptable existence" and "would not want to continue living in his present condition." The county public defender appointed to represent William also came to the conclusion that the petition was in his best interests.[3]

Ms. Gonzalez, who lived with William for the 12 years before his accident,[4] also filed a declaration in support of the conservator's petition. She appears to be the only person with whom William discussed his medical care preferences.

In her declaration, Ms. Gonzalez stated: "I am, without question or any possible doubt, convinced that William J. Drabick, III would not want to be kept alive in his present condition. I believe that he would want his physi-

---

[3] Since the county public defender agreed with the conservator's proposal to forego further treatment, he declined to file a brief on appeal. Subsequently, this court appointed the state public defender to represent William's interests on appeal. The state public defender has acted with the highest degree of professional skill and competence. We do not suggest, however, that it is always necessary to appoint appellate counsel under such circumstances.

[4] According to Ms. Gonzalez, "[f]or all intents and purposes, [William and she] were married."

cian to permanently remove the nasogastric tubes through which he receives nutrition and hydration. He would do this with full knowledge that such removal would result in his death. [¶] I say this because of numerous and explicit conversations I had with the conservatee about this subject."

William's conversations on this subject with Ms. Gonzalez "were occasioned by two events, or circumstances." As Ms. Gonzalez explained, "[o]ne event was the death of his father, which occurred while the conservatee and I were living together. While I do not believe that he was close to his father, the conservatee was very upset about the life prolonging treatment that was given to his father, a victim of cancer of the liver. It was the conservatee's understanding that his father was supported by a variety of medication, by a nasogastric tube, and he was incapacitated. It is my recollection that he said clearly and emphatically that he would never want to be kept alive by artificial means like his father was."

The·other circumstance was William's reaction to being diagnosed as having polycystic renal disease, an inherited and possibly fatal disorder which, while not curable, can be controlled somewhat by medication, diet, and avoidance of alcohol. According to Ms. Gonzalez, William "consistently chose to reject conservative, prophylactic medical advice about his diet and nonuse of alcohol. He and I argued about this often, and most recently in the spring of 1982 when the disease caused him to be hospitalized. . . . In the course of these recurring conversations, such as in the spring of 1982, he expressed his thoughts about the use of a kidney (dialysis) machine: 'I won't be attached to a kidney machine. If I die, I die.'"

Based on her knowledge of William, Ms. Gonzalez believes that "[h]e would not view his present existence as living in any acceptable sense. He would view it as an unacceptable assault on his rights and on his dignity. He would positively prefer to die without tube feeding or any other form of life-sustaining treatment."

At a hearing on the conservator's petition, Ms. Gonzalez testified that William said, after seeing his father maintained by artificial life support systems: " 'If anything ever happens to me, I would never want to be kept alive like that. . . . You've got to promise me that that's what would happen.'" In response to a request to "estimate . . . how many times [William] said he never wanted to be kept alive by artificial means," Ms. Gonzalez answered: "Twenty."

In addition to testimony by Ms. Gonzalez, the court also heard testimony by Dr. Klee and by David Drabick, the conservator. Dr. Klee testified as set out above, concluding that she does not believe that there is "any realistic

hope for recovery in any way." David Drabick testified that he and his brothers had discussed William's condition extensively and that they all felt "that the [nasogastric] tubes should be removed and William be allowed to die." Although David Drabick and his brothers never discussed the matter with William, they all "feel, based on his lifestyle and feelings about other matters, he would prefer this."

## C. *The Superior Court's Decision*

On July 10, 1986, the superior court denied the conservator's petition. In its opinion, the court observed that William "has been in a coma for a length of time" and that "[t]wo neurologists [have] examined the patient and concluded that the coma would probably persist." With respect to William's prognosis, the court further noted Dr. Klee's testimony "that one never really knows if this patient would recover, but since the coma lasted 3 years this might be unlikely."

To guide its decision, the court attempted to derive a standard from *Barber* v. *Superior Court* (1983) 147 Cal.App.3d 1006 [195 Cal.Rptr. 484, 47 A.L.R.4th 1] (*Barber*), which dismissed homicide charges against physicians who had complied with the request of a comatose patient's family to disconnect life support systems.[5] Quoting *Barber,* the court stated that " 'the determination as to whether the burdens of treatment are worth enduring for any individual patient depends upon the facts unique in each case, with the patient's interests and desires the key ingredients of the decision-making process.' " Applying this reasoning, the court found that "continued feeding is in the best interest of a patient who is not brain dead, in fact exhibits considerable brain activity." In conclusion, the court stated that it "empathize[d] with the family; however, based upon the evidence before it, denies the petition to allow the conservatee to starve and dehydrate to death."

## III. DISCUSSION

### A. *Decisions to Forego Medical Treatment and Barber v. Superior Court*

■ It is important to stress at the outset that no California statute or decision purports to require judicial approval of the conservator's decision to forego further medical treatment. Indeed, the only decision addressing

---

[5] We agree with the superior court that the *Barber* case provides critical guidance. However, as discussed below, we disagree with the superior court's application of the principles articulated in that case.

the matter holds to the contrary. In *Barber, supra,* 147 Cal.App.3d 1006, the court held that physicians could not be prosecuted for homicide on account of their removal, at the family's request and without a court order, of a respirator and intravenous tubes from a patient in a persistent vegetative state. The court also stated that, "in the absence of legislative guidance, we find no legal requirement that prior judicial approval is necessary before any decision to withdraw treatment can be made."[6] (*Id.* at p. 1021.)

On this point, *Barber* accords with decisions of the highest courts of several states. Indeed, it appears that every court to have addressed the matter[7] has concluded that judicial involvement is necessary in a decision to forego medical treatment for a persistently vegetative patient only if the interested parties disagree.

These observations do not change the procedural posture of this case. Since the conservator has petitioned for the court's approval, which he has the right to do (Prob. Code, § 2359, subd. (a)), we must address the court's obligations under those circumstances. We begin, however, by reviewing the *Barber* decision, which states that families and physicians may decide to forego treatment for persistently vegetative patients without judicial involvement. The *Barber* decision puts the conservatorship proceedings into a broader perspective. In light of *Barber,* it would be perverse to hold that an otherwise lawful course of action has been frustrated simply because the parties came to court in advance to obtain some certainty about their rights and obligations.

The patient in *Barber* became comatose shortly after undergoing surgery. Based on the physicians' advice that the prospect of recovery was extremely poor, the patient's family directed the physicians in writing to remove life-sustaining equipment, including a respirator and intravenous feeding tubes. During this period, the patient "received nursing care which preserved his dignity and provided a clean and hygienic environment." (147 Cal.App.3d at p. 1011.) After the patient died naturally as a result of his illness, his physicians were charged with murder and conspiracy to commit murder. The magistrate dismissed the complaint, the superior court reinstated the

---

[6] Although *Barber* was a criminal prosecution, the court's statement about judicial involvement was not dictum. The People had argued that the physicians' failure to treat was unlawful precisely because there had been no proceedings under the Probate Code. (147 Cal.App.3d at pp. 1020-1021.)

[7] *In re Guardianship of Grant, supra,* 747 P.2d at page 456; *Matter of Peter by Johanning, supra,* 529 A.2d at page 427; *Matter of Jobes, supra,* 529 A.2d at pages 449-450; *Rasmussen, supra,* 741 P.2d at page 691, *Matter of Conroy* (1985) 98 N.J. 321 [486 A.2d 1209, 1242]; *Matter of Conservatorship of Torres, supra,* 357 N.W.2d at page 341, fn. 4; *Matter of Welfare of Colyer, supra,* 660 P.2d at pages 750-751; *Matter of Storar, supra,* 438 N.Y.S.2d at page 276; *Matter of Quinlan, supra,* 355 A.2d at pages 669-672. See also footnote 14, *post.*

complaint, and the Court of Appeal reversed, thus ending the criminal prosecution.

Even though the Court of Appeal in *Barber* wrote in the context of a criminal prosecution, much of the court's reasoning has broad applicability to cases involving decisions to forego life-sustaining measures. The court began its analysis by acknowledging that homicide can result from an unlawful failure to perform a legal duty. (*Id.* at pp. 1017, 1022.) "Thus, the critical issue [became] one of determining the duties owed by a physician to a patient who has been reliably diagnosed as in a comatose state from which any meaningful recovery of cognitive brain function is exceedingly unlikely." (*Id.* at p. 1017.)

Analyzing the physicians' duties, the court reasoned that " '[a] physician . . . must exercise that degree of skill or care *usual* in the profession in the place in which he practices.' " (*Id.* at p. 1017, quoting from 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 514, p. 2778.) For persistently vegetative patients, life sustaining technology "is not being used to directly cure or even address the pathological condition. It merely sustains biological functions in order to gain time to permit other processes to address the pathology." (*Barber, supra,* 147 Cal.App.3d at p. 1017.) For some patients there comes a time when it is clear that treatment directed to the underlying pathological condition will not be effective; the patient will never be cured. In such cases, the *Barber* court concluded, "[a] physician has no duty to continue treatment, once it has proved to be ineffective." (*Id.* at pp. 1017-1018.) Accordingly, there was no "unlawful failure to perform a legal duty" upon which to base a homicide prosecution. (*Id.* at p. 1022.)

The medical ethical principle on which *Barber* is based now has authoritative support in the medical community. In 1986 the American Medical Association's Council on Ethical and Judicial Affairs stated in a formal opinion that, "[e]ven if death is not imminent but a patient's coma is beyond doubt irreversible and there are adequate safeguards to confirm the accuracy of the diagnosis and with the concurrence of those who have responsibility for the care of the patient, it is not unethical to discontinue all means of life-prolonging medical treatment."[8]

The evidence in the instant case appears to bring it squarely within the rationale of *Barber,* thus calling for approval of the conservator's decision. William's severe head injury would have caused his death five years ago if his physicians had not replaced a vital function with a nasogastric tube.[9]

---

[8] American Medical Association, Current Opinions of the Council on Ethical and Judicial Affairs (1986) § 2.18, quoted in *In re Guardianship of Grant, supra,* 747 P.2d at page 450.

[9] The court in *Barber, supra,* also stated that "[m]edical procedures to provide nutrition and hydration are more similar to other medical procedures than to typical human ways of

The decision to keep William alive immediately after his accident was the ordinary one that emergency care physicians make—to buy time in the hope that the patient can be cured. Now, however, after years of observation William's physicians agree that he cannot be cured. Thus, one question this case presents is whether, lacking any reasonable expectation of a cure, William's physicians have a legal obligation to continue to forestall an inevitable natural death.

From a medical standpoint the question is one of proportionality—whether the benefits of treatment outweigh the detriments. This concept underlies the *Barber* decision: "proportionate treatment is that which, in the view of the patient, has at least a reasonable chance of providing benefits to the patient, which benefits outweigh the burdens attendant to the treatment. Thus, even if a proposed course of treatment might be extremely painful or intrusive, it would still be proportionate treatment if the prognosis was for complete cure or significant improvement in the patient's condition. On the other hand, a treatment course which is only minimally painful or intrusive may nonetheless be considered disproportionate to the potential benefits if the prognosis is virtually hopeless for any significant improvement in condition." (*Id.* at p. 1019.)

As one recent article from the medical literature states, "[d]octors now choose from a vast array of interventions that, when combined with effective therapies for underlying conditions, often greatly prolong survival. Unfortunately, the quality of the additional life so skillfully sought can range from marginally tolerable to positively miserable." (Ruark, Raffin, & Stanford University Medical Center Committee on Ethics, *Special Article: Initiating and Withdrawing Life Support* (1988) 318 New Eng. J. Med. 25, 25.) Whether the benefits of treatment outweigh its detriments is a decision that engages personal and medical values, including ideas about the quality of life. It is not a decision that courts are constituted or especially well-qualified to make.

Above all, these decisions are for the persons affected by them. "In the absence of legislative guidance, [there is] no legal requirement that prior

---

providing nutrition and hydration. Their benefits and burdens ought to be evaluated in the same manner as any other medical procedure." (147 Cal.App.3d at pp. 1016-1017.) Courts in the following cases have agreed, and no final decision to the contrary appears. *Bouvia* v. *Superior Court* (1986) 179 Cal.App.3d 1127, 1141, 1145-1146 [225 Cal.Rptr. 297] (*Bouvia*); *In re Guardianship of Grant, supra,* 747 P.2d at pages 452-455; *In re Gardner, supra,* 534 A.2d at page 954; *Matter of Peter by Johanning, supra,* 529 A.2d at pages 427-428; *Matter of Jobes, supra,* 529 A.2d at page 444, footnote 9; *Delio* v. *Westchester County Med. Center, supra,* 516 N.Y.S.2d at page 689; *Brophy* v. *New England Sinai Hosp., Inc., supra,* 497 N.E.2d at pages 637-638; *Corbett* v. *D'Alessandro* (Fla.App. 1986) 487 So.2d 368, 371; *Matter of Conroy, supra,* 486 A.2d at pages 1233-1237; *In re Severns, supra,* 425 A.2d at page 160.

judicial approval is necessary before any decision to withdraw treatment can be made." (*Barber, supra,* 147 Cal.App.3d at p. 1021.) Nor is a standard for the decision lacking. As the *Barber* court stated, "the patient's interests and desires are the key ingredients of the decision-making process." (*Id.* at p. 1019.) But "[w]hen dealing with patients for whom the possibility of full recovery is virtually nonexistent, and who are incapable of expressing their desires, there is also something of a consensus on the standard to be applied. [¶] '[T]he focal point of decision should be the prognosis as to the reasonable possibility of return to cognitive and sapient life, as distinguished from the forced continuance of that biological vegetative existence . . . .' " (*Id.* at p. 1019, quoting from *Matter of Quinlan, supra,* 355 A.2d 647, 669.)

Subsequent decisions in this state have reinforced *Barber's* holding that courts are not the primary decisionmakers in the area of medical treatment. In *Bartling* v. *Superior Court* (1984) 163 Cal.App.3d 186 [209 Cal.Rptr. 220] (*Bartling*), and *Bouvia* v. *Superior Court* (1986) 179 Cal.App.3d 1127 [225 Cal.Rptr. 297] (*Bouvia*), courts held that physicians must respect competent patients' refusals to submit to further treatment. Moreover, both opinions could not have made it plainer that decisions in this area do not require routine judicial approval.

In the *Bartling* case, a competent, seriously ill patient's desire to die naturally was frustrated by health care providers who refused to comply with his instructions to disconnect a mechanical respirator. The hospital and physicians also refused to honor instructions by the patient's wife, whom the patient had authorized with a durable power of attorney to make medical treatment decisions. The court, finding that the patient had constitutional and common law rights to control his own medical treatment, held that the physicians were obliged to honor the patient's wishes. The court also made the following observations about the need for judicial intervention in future cases:

"Although our present case involves a civil action and factually is distinguishable from *Barber* in that Mr. Bartling was not comatose, we are now satisfied the law as outlined is clear and if Mr. Bartling had lived, real parties could not have been criminally or civilly liable for carrying out his instructions. Furthermore in future similar situations, parties facing the problems confronting real parties here should be free to act according to the patient's instruction without fear of liability and without advance court approval. In accord with our conclusion is the *Barber* court's statement that '. . . in the absence of legislative guidance, we find no legal requirement that prior judicial approval is necessary before any decision to withdraw treatment can be made.' " (*Bartling, supra,* 163 Cal.App.3d at p. 197, fn. omitted.)

Almost the identical situation arose two years later in *Bouvia, supra,* 179 Cal.App.3d 1127, in which health care providers refused to comply with a competent but seriously ill woman's demand to have a nasogastric feeding tube removed from her body. The trial court refused to compel the hospital and physicians to comply with the patient's wishes, but the court of appeals disagreed, holding that the patient "sought to enforce only a right which was exclusively hers and over which neither the medical profession nor the judiciary have any veto power." (*Id.* at p. 1135.)

Our citation of *Bartling* and *Bouvia,* which involved competent patients, is not intended to blur critical distinctions between competent and incompetent patients. Instead, we mean only to emphasize that courts do not have a general commission to supervise medical treatment decisions. Patients make their own treatment decisions with the advice of their physicians. Family members, and sometimes other persons, participate when the patients cannot. Courts, on the other hand, become involved only when no one is available to make decisions for a patient or when there are disagreements.

The *Barber* decision, which relies on these principles, has become enormously important in the five years since it appeared. Indeed, literature generated from within the medical community indicates that health care providers rely upon *Barber*—presumably every day—in deciding together with families to forego treatment for persistently vegetative patients who have no reasonable hope of recovery.[10]

For example, in 1985 a joint committee of the Los Angeles County medical and bar associations developed a set of "Principles and Guidelines Concerning the Foregoing of Life-Sustaining Treatment for Adult Patients" (hereafter Los Angeles Guidelines). The guidelines state that, "[b]ased upon two decisions by the California Court of Appeal [*Barber* and *Bartling*], physicians may forego (withhold or withdraw) life-sustaining treatment without prior court approval" in appropriate cases. One such case is that of

---

[10] While we have not seen statistics that purport to be complete, those that are available suggest both the importance of clear rules of behavior and the impracticability of routine judicial supervision. The Minnesota Supreme Court in *Matter of Conservatorship of Torres, supra,* 357 N.W.2d at page 341, footnote 4, reported that "on an average about 10 life support systems are disconnected weekly in Minnesota." In 1983 a presidential commission estimated that at any one time there were approximately 5000 permanently unconscious patients in the United States. Life-supporting treatment is withdrawn from many such patients. One physician reported to the commission that "between 500 and 1000 patients [at a single university hospital in Pittsburgh, Pennsylvania,] have had life-sustaining treatment withdrawn because of permanent loss of the important cortical layers of the brain." (President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Deciding to Forego Life-Sustaining Treatment: A Report on the Ethical, Medical, and Legal Issues in Treatment Decisions (1983) pp. 176-177, fn. 15 [hereafter Report of the President's Commission].)

"[a]n adult patient 'who has been reliably diagnosed as in a comatose state from which any meaningful recovery of cognitive brain function is exceedingly unlikely,' and whose surrogate decision-maker(s) concur(s) with the patient's physician that continued treatment is not likely to significantly improve the patient's prognosis for recovery and is, therefore, considered 'disproportionate' to any potential benefits from that treatment." (Los Angeles Guidelines, fns. omitted, quoting from *Barber, supra,* 147 Cal.App.3d at pp. 1006, 1017-1019.)[11]

On August 7, 1987, the California Department of Health Services promulgated a set of "Guidelines Regarding Withdrawal or Withholding of Life-Sustaining Procedure(s) in Long-Term Care Facilities." The guidelines are designed to assist the licensing surveyors who assess long-term health care facilities' compliance with regulatory requirements. Under California Code of Regulations, title 22, section 72315, subdivision (h), "[e]ach patient shall be provided with good nutrition and with necessary fluids for hydration." Relying on *Barber,* the department states that withholding of such measures from an incompetent patient "should not be construed to be a violation" of section 72315, subdivision (h) when the patient has been "reliably diagnosed as being in a comatose state from which any meaningful recovery of cognitive function is exceedingly unlikely" and when the patient's records contain "clear written evidence" of that prognosis, consultation between the physician and surrogate, consideration of the patient's expressed desires or best interests, the surrogate's determination, and the physician's order.

A further example of the medical community's acceptance of and reliance on *Barber* is a recent article in the New England Journal of Medicine suggesting principles for making decisions in this area. (Ruark, Raffin, & Stanford University Medical Center Committee on Ethics, *supra,* 318 New Eng. J. Med. 25.) The authors specifically rely on the *Barber* court's "proportionate treatment" analysis and its statement that conservatorship proceedings are not routinely necessary. (*Id.* at pp. 25-26.)

The *Barber* decision's impact on the case before us is twofold. First, although the procedural posture of this matter compels us to address the Probate Code's application in decisions to forego life-sustaining medical treatment, this opinion should not be read as suggesting that conservatorship proceedings are always necessary. Second, in light of *Barber's* recognition that the decision to forego treatment for a persistently vegetative patient is primarily ethical and not legal, the court's role in conservatorship

---

[11] The Los Angeles Guidelines are the latest version of a document that the President's Commission described in 1983 as "probably representative of unwritten policy in many other locations." (Report of the President's Commission, at p. 188, fn. omitted.)

proceedings must be correspondingly limited. Indeed, as discussed below, a conservator who has been given power under Probate Code section 2355 to make medical treatment decisions does not need further judicial approval for such decisions. (Prob. Code, § 2355, subd. (a).)

■ In view of these considerations, we do not believe that it is the court's role to substitute its judgment for the conservator's. Instead, when the conservator or another interested person has requested the court's approval the court should confine its involvement to ensuring that the conservator has made the type of decision for which the Probate Code expressly calls: a "good faith" decision "based on medical advice" whether treatment is "necessary." (Prob. Code, § 2355, subd. (a).)

B. *The Conservator's Statutory Power*

Since this case comes to us on appeal from an order denying a conservator's petition, we must ask whether the Probate Code authorizes the court to grant the petition. In contrast to some courts (see, e.g., *Matter of Farrell* (1987) 108 N.J. 335 [529 A.2d 404, 408]), we do not view our role as the quasi-legislative one of fashioning new standards to govern medical care decisions. As part of the judicial branch (see Cal. Const., art. III, § 3) all we may do is determine whether California law already authorizes the court to grant relief.

1. *Probate Code section 2355*

Since William Drabick has been adjudicated to lack capacity to give informed consent to medical treatment, Probate Code section 2355 sets out his conservator's powers. The statute provides as follows: "If the conservatee has been adjudicated to lack the capacity to give informed consent for medical treatment, the conservator has the exclusive authority to give consent for such medical treatment to be performed on the conservatee as the conservator in good faith based on medical advice determines to be necessary and the conservator may require the conservatee to receive such medical treatment, whether or not the conservatee objects. In any such case, the consent of the conservator alone is sufficient and no person is liable because the medical treatment is performed upon the conservatee without the conservatee's consent." (Prob. Code, § 2355, subd. (a).)

■ We are satisfied that this statute, by necessary implication, gives the conservator power to withhold or withdraw consent to medical treatment under appropriate circumstances. Probate Code section 2355 contemplates that the conservator faced with a decision about medical care will exercise his judgment. The statute expressly requires the conservator to obtain

"medical advice" and, on that basis, to "determine[ ]" in "good faith" whether treatment is "necessary." (Prob. Code, § 2355, subd. (a).) Following this process, the conservator may consent to treatment. Just as importantly, however, the conservator may also withhold consent. Unless Probate Code section 2355 is read to include that correlative power, the statute would simply—and absurdly—require the conservator to approve blindly all medical recommendations. This cannot be what the Legislature intended, since to deny conservators the power to withhold consent would render meaningless the statutory references to a decisional process.

Courts in other states have interpreted their own, similar conservatorship statutes to confer by implication the power to withhold consent to medical treatment. (E.g., *Rasmussen by Mitchell* v. *Fleming* (1987) 154 Ariz. 207 [741 P.2d 674, 687] (*Rasmussen*); *Matter of Guardianship of Hamlin* (1984) 102 Wn.2d 810 [689 P.2d 1372, 1375]; *Matter of Conservatorship of Torres* (Minn. 1984) 357 N.W.2d 332, 337; *Matter of Welfare of Colyer* (1983) 99 Wn.2d 114 [660 P.2d 738, 746].) In *Rasmussen, supra,* the Arizona Supreme Court construed a statute providing that " '[a] guardian may give any consents or approvals that may be necessary to enable the ward to receive medical or other professional care, counsel, treatment or service.' " (741 P.2d at p. 687.) Although one party argued that the statutory right to consent did not include the right to withhold consent, the court disagreed. The court's reasoning is equally applicable in California: "the right to consent to or approve the delivery of medical care must necessarily include the right to consent to or approve the delivery of *no* medical care. To hold otherwise would, as the Washington and Minnesota supreme courts observed, ignore the fact that oftentimes a patient's interests are best served when medical treatment is withheld or withdrawn. To hold otherwise would also reduce the guardian's *control over medical treatment* to little more than a mechanistic rubberstamp for the wishes of the medical treatment team. This we decline to do." (*Id.* at p. 688.)

The statutes at issue in the Washington and Minnesota cases were similarly phrased. In two decisions, *Matter of Guardianship of Hamlin, supra,* and *Matter of Welfare of Colyer, supra,* the Washington Supreme Court found implied authority to withhold consent to medical treatment in a statute authorizing a guardian "to care for and maintain the incompetent or disabled person, assert his or her rights and best interests, and provide timely, informed consent to necessary medical procedures." (*Matter of Guardianship of Hamlin, supra,* 689 P.2d 1372 at p. 1375; *Matter of Welfare of Colyer, supra,* 660 P.2d at p. 746.) Similarly, the Minnesota Supreme Court found such authority in a statute stating that the powers of a conservator "include, but are not limited to . . . [t]he power to give any necessary consent to enable the ward or conservatee to receive necessary medical or

other professional care, counsel, treatment or service . . . ." (*Matter of Conservatorship of Torres, supra,* 357 N.W.2d at p. 337, italics omitted.)

These authorities are persuasive in this case because they make a commonsense point about statutory interpretation: a statute that requires a person to make a decision contemplates a decision either way. As mentioned, unless we construe Probate Code section 2355 to permit a conservator to decide either that medical treatment is necessary *or* that it is not, the statute's reference to a good faith decision would be meaningless.

We are aware that the Attorney General in a 1982 opinion came to the conclusion that "[a] California superior court lacks jurisdiction to order or approve the withholding or withdrawal of extraordinary life support systems or procedures from a person made a ward or conservatee pursuant to the Probate Code."[12] (65 Ops.Cal.Atty.Gen. 417 (1982).) However, the 1982 opinion fails to consider the effect of Probate Code section 2355, subdivision (a). Instead, the opinion is based solely on section 2357, which sets out a procedure for obtaining judicial consent for treatment not already authorized in another section of the code. (Prob. Code, § 2357, subd. (b).) When, as in William's case, a conservator already has power under section 2355 to make medical treatment decisions, there is no occasion to resort to section 2357.

### 2. *The limited statutory basis for judicial approval*

This case arose because the conservator chose to seek the court's approval. The conservator did not file his petition because there was opposition but, in his own words, "to obtain a court order that would remove any doubts about the legality or propriety of such action and, thereby, protect the medical care providers from potential action—legal, administrative, other—against them."[13]

However, court approval is not required for medical treatment decisions under Probate Code section 2355. The statute provides that "the conservator has the *exclusive authority* to give consent for such medical treatment . . . as the conservator in good faith based upon medical advice

---

[12] The only decision that mentions the Attorney General's opinion rejects it. In *Dority* v. *Superior Court* (1983) 145 Cal.App.3d 273, 280, fn. 4 [193 Cal.Rptr. 288], the court stated without further discussion that it had "examined the opinion and [was] not persuaded by its logic."

[13] The court had power to hear the conservator's petition under Probate Code section 2359, which provides: "Upon petition of the guardian or conservator or ward or conservatee or other interested person, the court may authorize and instruct the guardian or conservator or approve and confirm the acts of the guardian or conservator." (Prob. Code, § 2359, subd. (a).)

determines to be necessary . . . ." (Prob. Code, § 2355, subd. (a), italics added.) The statute confers authority in broad terms without distinguishing between relatively minor and relatively major decisions.

There does not appear to be any decision holding that prior judicial approval is required before treatment can be withdrawn from a patient in a persistent vegetative state.[14] Decisions eschewing any such requirement abound: the highest courts of Arizona, Minnesota, New Jersey, New York, and Washington have squarely held that routine judicial intervention is not required.[15] In New Jersey, for example, "judicial review of such decisions is not necessary or appropriate," unless there is a dispute among the members of a patient's family, the guardian, and the physicians, in which case any interested party can invoke judicial aid to ensure that the relevant guidelines are properly followed and that the patient is protected.[16] (*Matter of Jobes* (1987) 108 N.J. 394 [529 A.2d 434, 449], fn. omitted; see also *Matter of Peter by Johanning* (1987) 108 N.J. 365 [529 A.2d 419, 427].)

Since Probate Code section 2355 does not require approval of the conservator's treatment decisions, we do not feel free to impose such a requirement. Nor is there any reason to assume that the absence of such a requirement will lead to abuses of the conservator's power in doubtful cases. Several provisions of the Probate Code create opportunities for judicial

[14]*Superintendent of Belchertown* v. *Saikewicz* (1977) 373 Mass. 728 [370 N.E.2d 417, 434-435] is sometimes cited for the proposition that judicial approval is always required. That case, however, involved not a comatose patient but a severely retarded patient with leukemia. The question was whether a guardian might refuse chemotherapy on the ground that "the inability of the ward to understand the treatment to which he would be subjected and the fear and pain he would suffer as a result, outweighed the limited prospect of any benefit from such treatment, namely, the possibility of some uncertain but limited extension of life." (*Id.* at p. 419.) On these facts, the court stated that it did "not view the judicial resolution of this most difficult and awesome question—whether potentially life-prolonging treatment should be withheld from a person incapable of making his own decision—as constituting a 'gratuitous encroachment' on the domain of medical expertise." (*Id.* at p. 435.)

Subsequent cases in Massachusetts have effectively undermined the *Saikewicz* decision's authority, at least in the context of persistently vegetative patients. The court in *Matter of Dinnerstein* (1978) 6 Mass.App. 466 [380 N.E.2d 134, 137-139] argued that judicial approval is required only under the facts of *Saikewicz,* that is, when the treatment proposed to be withdrawn offers some hope of a cure. In *Matter of Spring* (1980) 380 Mass. 629 [405 N.E.2d 115, 120], the Supreme Judicial Court of Massachusetts stated that *Saikewicz* "should not be taken to establish any requirement of prior judicial approval that would not otherwise exist" and that neither civil nor criminal liability automatically follows action without prior approval. Most recently, in *Brophy* v. *New England Sinai Hosp., Inc., supra,* 497 N.E.2d 626, the same court permitted the guardian of a persistently vegetative patient to direct the cessation of life-support measures without addressing the need for judicial approval.

[15] See footnote 7, *ante.*

[16] The New Jersey Supreme Court has also stated that, "[e]ven when judicial intervention is proper, the trial court's decision need not and should not always be appealed." (*Matter of Jobes, supra,* 529 A.2d at p. 449, fn. 17.) In the absence of statutory authority to the contrary, this observation is self-evidently correct.

involvement as necessary. The most important of these provisions is Probate Code section 2359, which permits any "interested person" to petition for instructions or for approval of the conservator's actions. Thus, family members, physicians, health care facilities, and other interested persons may still invoke judicial oversight when there is a proper reason to question the conservator's decision.[17]

## C. *The Conservatee's Fundamental Rights*

The principles underlying *Barber* and discussed more fully in this opinion substantially limit judicial involvement in the decision whether to continue treatment for a persistently vegetative patient. (*Barber, supra,* 147 Cal.App.3d 1006.) To summarize: faced with a persistently vegetative patient and a diagnosis establishing that further treatment offers no reasonable hope of returning the patient to cognitive life, the decision whether to continue noncurative treatment is an ethical one for the physicians and family members or other persons who are making health care decisions for the patient.[18] Under *Barber,* physicians are not liable for actions taken in accordance with accepted medical standards. Moreover, when a conservator has authority under section 2355 for medical treatment decisions, there is no need for judicial approval absent a disagreement among the interested persons. When an interested person does seek the court's approval, the court's role is limited to determining whether the conservator has made a good faith decision based upon medical advice. (Prob. Code, § 2355, subd. (a).)

Our analysis cannot end there, however. The state public defender argues that the state's interest in preserving life precludes granting the conservator's petition. In opposition, William's conservator argues that the right to refuse treatment survives incompetence and outweighs the state's interest in preserving life.[19]

---

[17] Other provisions create an opportunity for judicial supervision at the time a conservator is appointed. For example, the court may "insert in the order of appointment conditions not otherwise obligatory providing for the care, treatment, . . . and welfare of the ward or conservatee." (Prob. Code, § 2358.) In addition, "the court, in its discretion, may limit the powers and duties that the conservator would otherwise have" when that "is appropriate in the circumstances of the particular conservatee." (Prob. Code, § 2351, subd. (b).)

[18] Note that, under the American Medical Association's formal ethical opinion, the "concurrence of those who have responsibility for the care of the patient" is a necessary component of the ethical decision whether to forego life sustaining treatment for an irreversibly comatose patient. See footnote 8, *ante,* and accompanying text.

[19] The weight of judicial authority supports the conservator's argument. *In re Gardner, supra,* 534 A.2d at pages 950-952; *Matter of Jobes, supra,* 529 A.2d at page 444; *In re Peter by Johanning, supra,* 529 A.2d at page 427; *Rasmussen, supra,* 741 P.2d at pages 685-688; *Delio v. Westchester County Med. Center, supra,* 516 N.Y.S.2d at page 686; *Brophy* v. *New England Sinai Hosp., Inc., supra,* 497 N.E.2d at pages 635-637; *In re Conroy, supra,* 486 A.2d at pages

The first court to base a treatment-withdrawal decision on the rights of a comatose patient was the New Jersey Supreme Court in *Matter of Quinlan, supra.* That seminal case involved a young woman, Karen Quinlan, who had existed for several years in a persistent vegetative state. (355 A.2d at pp. 653-654.) Like William Drabick, Karen Quinlan was not brain-dead but had some brain activity consistent with her clinical state. (*Id.* at p. 654.) Recognizing both Karen's right to determine her own medical treatment and her inability to exercise the right, the court determined that her "right of privacy may be asserted on her behalf by her guardian under the peculiar circumstances here present." (*Id.* at p. 664.)

The *Quinlan* court's rationale has become the cornerstone for most of the subsequent decisions in this area: "If a putative decision by Karen to permit this non-cognitive, vegetative existence to terminate by natural forces is regarded as a valuable incident of her right of privacy, as we believe it to be, then it should not be discarded solely on the basis that her condition prevents her conscious exercise of the choice. The only practical way to prevent destruction of the right is to permit the guardian and family of Karen to render their best judgment . . . as to whether she would exercise it in these circumstances." (*Id.* at p. 664.)

In the years since the *Quinlan* decision, most courts have adopted the formula that a patient's "right to choose" or "right to refuse" medical treatment survives incompetence. It would be more accurate to say that incompetent patients retain the right to have appropriate medical decisions made on their behalf. An appropriate medical decision is one that is made in the patient's best interests, as opposed to the interests of the hospital, the physicians, the legal system, or someone else. Whatever term one uses to describe the right that an incompetent person retains, however, we are satisfied that the basic analysis is valid in California.  ██ To summarize, California law gives persons a right to determine the scope of their own medical treatment, this right survives incompetence in the sense that incompetent patients retain the right to have appropriate decisions made on their behalf, and Probate Code section 2355 delegates to conservators the right and duty to make such decisions. The state's interest in preserving life does not outweigh the patient's own rights.

1223-1224; *Matter of Conversatorship of Torres, supra,* 357 N.W.2d at pages 339-340; *Matter of Welfare of Colyer, supra,* 660 P.2d at pages 743-744; *Foody* v. *Manchester Memorial Hosp., supra,* 482 A.2d at pages 718-720; *John F. Kennedy Hosp.* v. *Bludworth, supra,* 452 So.2d at pages 924-926; *In re Guardianship of Barry, supra,* 445 So.2d at pages 370-321; *In re L.H.R., supra,* 321 S.E.2d at pages 722-723; *In re Severns, supra,* 425 A.2d at page 159; *Matter of Quinlan, supra,* 355 A.2d at pages 663-634.

### 1. *The right to refuse medical treatment*

The first step of this analysis—that each person has a right to determine the scope of his own medical treatment—is well established in this state.[20] In *Cobbs* v. *Grant* (1972) 8 Cal.3d 229 [502 P.2d 1], the Supreme Court held that "when a doctor performs an operation to which the patient has not consented" there is a battery. (*Id.* at p. 240.) "The obvious corollary to this principle is that a competent adult patient has the legal right to refuse medical treatment."[21] (*Barber, supra,* 147 Cal.App.3d at p. 1015.)

Courts in subsequent cases have relied on *Cobbs* v. *Grant, supra,* to hold that competent patients were entitled to refuse medical treatment necessary to sustain life and that medical care providers would be required to respect the patients' decisions. For example, the court in *Bartling, supra,* 163 Cal.App.3d 186, observed that, "[i]f the right of the patient to self-determination as to his own medical treatment is to have any meaning at all, it must be paramount to the interests of the patient's hospital and doctors." (*Id.* at p. 195.)

The California Legislature has also recognized the right to control one's own medical treatment and declared it to be fundamental. In Health and Safety Code section 7186, which contains the findings and declarations underlying the Natural Death Act, "[t]he Legislature finds that adult persons have the fundamental right to control the decisions relating to the rendering of their own medical care, including the decision to have life-sustaining procedures withheld or withdrawn in instances of a terminal condition." While we do not suggest that this legislative finding was expressly intended to control the interpretation of the Probate Code's conservatorship provisions, the finding is sufficient evidence of the existence of the right and its recognition as fundamental by the people of the State through their elected representatives.

---

[20] This right is grounded both in the constitutional right of privacy and in the common law. *Cobbs* v. *Grant, supra,* 8 Cal.3d at pages 242-243; *Keyhea* v. *Rushen* (1986) 178 Cal.App.3d 526, 540 [223 Cal.Rptr. 746]; *Bartling, supra,* 163 Cal.App.3d at page 195; *Foy* v. *Greenblott* (1983) 141 Cal.App.3d 1, 11 [190 Cal.Rptr. 84]; *Bouvia, supra,* 179 Cal.App.3d at pages 1137-1138.

[21] Judicial recognition of this right is often traced to *Schloendorff* v. *Society of New York Hospital* (1914) 211 N.Y. 125 [105 N.E. 92, 93], in which Judge Cardozo wrote that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages." See also *Bouvia, supra,* 179 Cal.App.3d at pages 1137-1142; *Brophy* v. *New England Sinai Hosp., Inc., supra,* 497 N.E.2d at pages 632-644; *Matter of Quinlan, supra,* 355 A.2d at page 663.

2. *The effect of incompetence on the right to refuse medical treatment*

These authorities amply demonstrate that William, were he still competent, would be entitled to determine the scope of his own medical care, even to the extent of directing his physicians to withhold life-sustaining treatment. The second step in the analysis—that this fundamental right survives incompetence in some form—is also valid in California.

In the three California cases touching upon this area, there was no occasion to decide this question. (*Barber, supra*, 147 Cal.App.3d 1006; *Bartling, supra*, 163 Cal.App.3d 186; *Bouvia, supra*, 179 Cal.App.3d 1127.) Nevertheless, there is substantial authority in California for the general proposition that incompetent persons retain certain fundamental rights.

In *Conservatorship of Valerie N.* (1985) 40 Cal.3d 143 [219 Cal.Rptr. 387, 707 P.2d 760] (*Valerie N.*) the Supreme Court considered the effect of a statute prohibiting the sterilization of wards and conservatees under the authority of courts sitting in probate. The statute, which provided that "[n]o ward or conservatee may be sterilized under the provisions of this division" (Prob. Code, § 2356, subd. (d)), followed "a rising tide of criticism of compulsory sterilization." (*Valerie N., supra*, at p. 155, fn. omitted.) The conservatee, Valerie N., was an adult, incompetent, severely retarded victim of Down's Syndrome. (*Id.* at p. 148.) The court asked whether Valerie N. had the same fundamental rights as a competent person in the area of procreative choice and expressly decided that she did, despite the statutory prohibition of sterilizations.

The court's analysis of the continuance of a fundamental right, despite the incompetent holder's inability to exercise it in the usual sense, bears directly on the issues in this case. The court stated that, "[i]n its enactment of [the statute barring sterilization], and the omission of any provision in other legislation authorizing sterilization of incompetent developmentally disabled persons, the Legislature has denied incompetent women the procreative choice that is recognized as a fundamental, constitutionally protected right of all other adult women. We realize that election of the method of contraception to be utilized, or indeed whether to choose contraception at all, cannot realistically be deemed a 'choice' available to an incompetent since any election must of necessity be made on behalf of the incompetent by others. The interests of the incompetent which mandate recognition of procreative choice as an aspect of the fundamental right to privacy and liberty do not differ from the interests of women able to give voluntary consent to this procedure, however." (*Valerie N., supra*, 40 Cal.3d at pp. 161-162.)

In essence, *Valerie N.* stands for the proposition that incompetence does not cause the loss of a fundamental right from which the incompetent person can still benefit. As the court stated, "[a]n incompetent developmentally disabled woman has no less interest in a satisfying or fulfilling life free from the burdens of an unwanted pregnancy than does her competent sister." (*Id.* at p. 163.)

In William Drabick's case, we must frankly acknowledge that his non-cognitive state prevents him from choosing anything. Thus, to claim that his "right to choose" survives incompetence is a legal fiction at best.[22] While William's condition may prevent conscious choice, however, it does not by any means follow that he has no protected, fundamental interest in the medical treatment decisions that affect him.

We are convinced that we deprive William of a fundamental right if we uphold the superior court's decision. At present, William's treatment is determined solely as a matter of medical technology; his life is prolonged because it is possible, not because anyone purporting to speak for him has decided that this is the best or the wisest course. Under California law, however, human beings are not the passive subjects of medical technology. The line of decisions beginning with *Cobbs* v. *Grant* and continuing with *Barber, Bartling,* and *Bouvia* compel this conclusion. These cases recognize that medical care decisions must be guided by the individual patient's interests and values. Allowing persons to determine their own medical treatment is an important way in which society respects persons as individuals. Moreover, the respect due to persons as individuals does not diminish simply because they have become incapable of participating in treatment decisions. While William's coma precludes his participation, it is still possible for others to make a decision that reflects his interests more closely than would a purely technological decision to do whatever is possible. Lacking the ability to decide, he has a right to a decision that takes his interests into account.

3. *Exercise of the conservatee's rights by the conservator*

The decision in *Valerie N.* adequately demonstrates that a person does not lose certain fundamental rights because of incompetence. ■ This recognition leads to the third step in the analysis: is it necessary for a conservator to exercise the fundamental right in question in order to prevent its loss?[23]

---

[22] For thoughtful criticisms of the legal fiction, see Tribe, American Constitutional Law (2d ed. 1988) § 15-11, at page 1368, footnote 25, and Dresser, *Life, Death, and Incompetent Patients: Conceptual Infirmities and Hidden Values in the Law* (1986) 28 Ariz. L.Rev. 373.

[23] The court in *Valerie N., supra,* answered the analogous question in that case affirmatively: "True protection of procreative choice can be accomplished only if the state

Once it is acknowledged that William Drabick has a right to have medical treatment decisions made in his best interests, it is readily apparent that the right is meaningless unless someone is permitted to make the decisions.

To delegate an incompetent person's right to choose inevitably runs the risk that the surrogate's choices will not be the same as the incompetent's hypothetical, subjective choices.[24] Allowing someone to choose, however, is more respectful of an incompetent person than simply declaring that such a person has no more rights. Thus, by permitting the conservator to exercise vicariously William's right to choose, guided by his best interests, we do the only thing within our power to continue to respect him as an individual and to preserve his rights. As another court has observed, "[w]e do not pretend that the choice of [the incompetent's] parents, her guardian *ad litem,* or a court is her own choice. But it is a genuine choice nevertheless—one designed to further the same interests she might pursue had she the ability to decide herself. We believe that having the choice made in her behalf produces a more just and compassionate result than leaving [her] with no way of exercising a constitutional right." (*In re Grady* (1981) 85 N.J. 235 [426 A.2d 467, 481], quoted in *Valerie N., supra,* 40 Cal.3d at p. 167.)

The state public defender argues that, "[v]iewing the privacy right as a constitutional one, it can be restricted by state regulation which is supported by a rational basis, in view of the state's interest in preserving life." However, to speak of the state's interest in preserving life is really to miss the point.[25] To put it more precisely, the state has an interest in protecting William's right to have appropriate medical treatment decisions made on his behalf. The problem is not to preserve life under all circumstances but to make the right decisions. A conclusive presumption in favor of continuing treatment impermissibly burdens a person's right to make the other choice.

The Court in *Valerie N., supra,* faced an analogous problem. The respondent in that case, opposing the argument that an incompetent person had a right to undergo sterilization, argued that "the interest of the state in safeguarding the right of an incompetent *not* to be sterilized justifies barring all nontherapeutic sterilization of conservatees who are unable personally to

permits the court-supervised substituted judgment of the conservator to be exercised on behalf of a conservatee who is unable to personally exercise this right." (40 Cal.3d at p. 168.)

[24] This is true even when one has previously expressed one's treatment preferences repeatedly and forcefully, since a change of mind is always possible.

[25] The *Bouvia* and *Bartling* cases demonstrate that the state's interest in preserving life is not superior to the individual's right to control his own medical treatment. As the court in *Bartling* observed: "if the right of the patient to self-determination as to his own medical treatment is to have any meaning at all, it must be paramount to the interests of the patient's hospital and doctors." (*Bartling, supra,* 163 Cal.App.3d at p. 195; see also *Bouvia, supra,* 179 Cal.App.3d at p. 1135.)

consent." (40 Cal.3d at p. 164.) The Court rejected this argument, stating as follows: "We do not doubt that it is within the police power of the state to enact legislation designed to protect the liberties of its residents. The inquiry does not end there, however, since *the means selected are not simply protective of a liberty interest, but restrict the exercise of other fundamental rights by or on behalf of the incompetent.*" (*Id.* at p. 164, italics added.)

Like *Valerie N.,* this case presents a conflict between two important rights. Both the fundamental right to life—to continue receiving treatment—and the right to terminate unwanted treatment deserve consideration. Someone acting in William's best interests can and must choose between them.

4. *The limited relevance of the patient's prior informal statements*

■ The statutory delegation of power to the conservator should not be confused with the different idea—which we do not accept—that an incompetent person's own prior informal statements *compel* either the continuance or cessation of treatment in a particular case. While a conservator may consider the conservatee's known preferences together with all other information bearing on the conservatee's best interests, a conservator with no such information still has the right and duty to make treatment decisions.

As mentioned above, there is substantial evidence in this case that William would not have wanted to be kept alive by artificial means. Ms. Gonzalez, who lived with William for 12 years, testified he said repeatedly that he would not want to be kept alive by artificial means. The state public defender, however, argues that William's prior statements should not be considered at all. The superior court did not discuss this issue.

In order to determine what weight to assign to William's prior statements, it is necessary to put this debate into context.[26] William's conservator has the exclusive right and duty under section 2355 to determine in good faith whether medical treatment is necessary. Under *Barber,* " 'the focal point of decision' " for a persistently vegetative patient " 'should be the prognosis as to the reasonable possibility of return to cognitive and sapient life, as distinguished from the forced continuance of that biological vegeta-

---

[26] While assigning different weights to the patient's prior statements, most courts allow the medical decisionmakers to consider them. See, e.g., *In re Guardianship of Grant, supra,* 747 P.2d at page 457; *In re Gardner, supra,* 534 A.2d at pages 952-953; *Rasmussen, supra,* 741 P.2d at pages 688-689; *Brophy* v. *New England Sinai Hosp., Inc., supra,* 497 N.E.2d at pages 631-632, 635; *Matter of Conservatorship of Torres, supra,* 357 N.W.2d at page 341; *Matter of Welfare of Colyer, supra,* 660 P.2d at pages 747-748; *Matter of Storar, supra,* 438 N.Y.S.2d at page 274; *In re Severns, supra,* 425 A.2d at pages 159-160.

tive existence. . . .'" (147 Cal.App.3d at p. 1019, quoting from *Matter of Quinlan, supra,* 355 A.2d 647, 669.) But while the prognosis is of central importance, a hopeless prognosis does not compel the decision to forego further treatment. The conservator must still make a good faith decision consistent with the patient's best interests.

Some courts have taken the position that an incompetent patient's hypothetical desire to forego life-sustaining treatment must be proved by clear and convincing evidence or some other standard and, when so proved, is conclusive. This approach presents several serious problems. First, we have found no authority—other than cases on the subject of life-sustaining treatment—to support the idea that a person can exercise (or waive) a fundamental constitutional and common law right unintentionally through informal statements years in advance. It would be a dangerously unpredictable precedent. Second, if one bases the treatment of persistently vegetative patients not on the statutory delegation of rights to a conservator but on the theory that an evidentiary hearing can reveal the patient's own hypothetical choice, one is left with no consistent basis for a decision when a patient has been silent on the matter.[27] Third, the approach is contrary to the apparent intent of Probate Code section 2355, which is to give the conservator "exclusive" authority for medical treatment decisions. This authority is so absolute that section 2355 validates the conservator's decisions "whether or not the conservatee objects."

There is no need, however, to adopt such a rule. Stated precisely, the apparent role of the conservatee's prior statements under existing law is this: the conservatee's prior statements inform the decision of the conservator, who must vicariously exercise the conservatee's rights. Such statements do not in themselves amount to the exercise of a right.[28] The statute gives the conservator the exclusive authority to exercise the conservatee's rights, and it is the conservator who must make the final treatment decision regardless of how much or how little information about the conservatee's

[27] New York law arrived at this predicament with the companion cases of *Matter of Storar* and *Eichner* v. *Dillon, supra,* 438 N.Y.S.2d at pages 274-275. After *Storar,* as a lower court recently noted, where "there is no compelling evidence of the incompetent patient's wishes, the law in this state, is at best unsettled as to when, if ever, life prolonging measures may be withheld." (*Matter of Beth Israel Medical Center* (1987) 136 Misc.2d 931 [519 N.Y.S.2d 511, 514].) The same court, faced with a patient who had made no definitive statements on the subject, held that "if the right to refuse treatment and allow life to terminate through natural forces is to be regarded as a valuable incident of the right to privacy, such right should not be rejected solely because the incompetent patient may not have sufficiently, at any time, manifested his wishes." (*Id.* at p. 515.) Departing from *Storar's* analysis, the court held that a decision to forego treatment could also be based on a multi-factored best interests determination.

[28] Except, of course, when the incompetent person's statements take the form of durable power of attorney for health care (Civ. Code, § 2500) or a directive under the Natural Death Act (Health & Saf. Code, §§ 7186 to 7195).

preferences is available. There is no necessity or authority for adopting a rule to the effect that the conservatee's desire to have medical treatment withdrawn must be proved by clear and convincing evidence or another standard. Acknowledging that the patient's expressed preferences are relevant, it is enough for the conservator, who must act in the conservatee's best interests, to consider them in good faith.

## 5. *The conservatee's counsel*

The superior court appointed the county public defender to represent William Drabick in the proceedings below. After investigating the case, the public defender came to agree with the conservator that William would have refused life-sustaining treatment.[29] ■ The state public defender, who represents William on appeal,[30] contends that William's former counsel did not adequately represent his interests.

The state public defender argues that William's counsel must advocate continued treatment, reasoning that his constitutionally protected right to life is entitled to representation and that "[t]he irreducible minimum condition of effective representation is the adoption of an adversary position toward the opposing party." The flaw in this argument is that it does not take into account William's other rights. If his best interests require unchosen treatment to end, his fundamental right to achieve that result also deserves representation.

There is no authority in California law for requiring a permanently unconscious conservatee's attorney to oppose a petition that the attorney believes to be in the conservatee's best interests. When an incompetent conservatee is still able to communicate with his attorney it is unclear whether the attorney must advocate the client's stated preferences—however unreasonable—or independently determine and advocate the client's best interests. (See Johnstone, Cal. Conservatorships 2d (Cont.Ed.Bar 1983) § 1.62, at p. 42.) When the client is permanently unconscious, however, the attorney must be guided by his own understanding of the client's best interests. There is simply nothing else the attorney can do.

---

[29] The county public defender described his investigation in the case as follows: "Since my role is to represent the conservatee in these matters, I investigated the situation by calling a relative in Pennsylvania to see if she knew any improper motive which could be involved, such as greed. I talked at length to William's physician, Dr. Wendy Klee. I also telephoned the administrator of the convalescent hospital where William 'resided.' Finally, along with David's attorney and [the superior court judge], I went to the hospital and 'met' my client. He was comatose, as he had been for almost three years."

[30] See footnote 3, *ante.*

Probate Code 1470 authorized appointment of counsel in this case but does not specify counsel's role.[31] The section's legislative history is also not very specific, but it certainly cannot be read to support the argument that a conservatee's attorney must oppose the conservator's petitions. According to the Law Revision Commission, which proposed Probate Code section 1470, the court's discretionary authority to appoint counsel in conservatorship proceedings "is comparable to the court's authority [under Civil Code section 4606] to appoint private counsel to represent the minor's interests in connection with a child custody issue arising in a proceeding under the Family Law Act." (Cal. Law Rev. Com. com. to Prob. Code § 1470; see also 14 Cal. Law Revision Com. Rep. (1978) pp. 501, 538.) California law does not clearly define the role of the child's counsel in a custody dispute. By analogy, however, courts have held that the child's attorney in a dependency proceeding must provide "independent counsel" and not act as a "mouthpiece" for the minor child or the governmental agency. (*In re David C.* (1984) 152 Cal.App.3d 1189, 1208 [200 Cal.Rptr. 115]; cf. *In re Mary M.* (1986) 180 Cal.App.3d 1058, 1066 [226 Cal.Rptr. 5].)

Decisions from other states clearly support the conservator's argument against automatic opposition to the petition. The issue usually arises in the context of determining the responsibilities of a guardian ad litem, as opposed to the guardian or conservator of the person. The Washington Supreme Court, for example, has held that the guardian ad litem in treatment withdrawal cases "need not necessarily play an adversarial role with respect to the guardian [of the person]'s petition; his role is rather to ensure that the incompetent's interests are being protected." (*Matter of Welfare of Colyer, supra,* 660 P.2d at p. 748; see also *Rasmussen, supra,* 741 P.2d at p. 690, and *Delio* v. *Westchester County Med. Center, supra,* 516 N.Y.S.2d 677, 685.)[32]

Because there is no authority for requiring William's attorney to oppose the conservator's petition, we reject the state public defender's suggestion

[31] No statute requires the court to appoint counsel when a conservator already has authority under section 2355 to make medical treatment decisions. Nevertheless, as in all conservatorship proceedings, the court may appoint counsel for the conservatee "if the court determines that such person is not otherwise represented by legal counsel and that the appointment would be helpful to the resolution of the matter or is necessary to protect the person's interests." (Prob. Code, § 1470, subd. (a); see also Gov. Code, § 27706, subd. (d) (representation of indigents by public defender).) When a disagreement among the interested parties has made judicial supervision necessary, appointment of counsel is desirable.

In contrast, if the conservator does not already have authority to make medical treatment decisions, appointment of counsel is mandatory under Probate Code section 2357. (Prob. Code, § 2357, subds. (a), (e); see also Prob. Code, § 1471.)

[32] Respondent calls our attention to *Matter of Conservatorship of Torres, supra,* 357 N.W.2d at page 333, in which the Minnesota Supreme Court congratulated the attorneys for "adversely presenting the issues." However, the court did not discuss the role of the conservatee's counsel.

that the conservatee's original attorney acted improperly. We also decline to hold that the attorney for the conservatee in any future proceedings in this case will be required to oppose the conservator's petition. Instead, the conservatee's attorney must advocate the conservatee's best interests.

### D. *The Effect of the Natural Death Act and the Statutory Durable Power of Attorney for Health Care*

William Drabick, while still competent, did not provide written directions about medical care to those who now have to make the decisions. The Legislature has passed two statutes that operate in this general area. Under the Natural Death Act (Health & Saf. Code, §§ 7186 to 7195), a competent adult may "make a written directive instructing his physician to withhold or withdraw life-sustaining procedures in the event of a terminal condition." (Health & Saf. Code, § 7186.) Under Civil Code section 2500, a competent adult may designate an agent to make health care decisions, including the decision to withhold treatment necessary to sustain life. (Civ. Code, § 2500 [Statutory Form Durable Power of Attorney for Health Care].)

■ The state public defender argues that the documents these statutes authorize "must be construed as the exclusive means by which a competent individual can express legally cognizable wishes" about the withholding of life-sustaining measures. In view of our holding that William's right to refuse medical treatment could be exercised by his conservator even if there were no evidence of William's views on the subject, respondent's argument is not clearly relevant. If the argument were intended, however, to preclude any decision to stop life-sustaining treatment outside of the statutory mechanisms, or to preclude a conservator from considering a conservatee's informally expressed views on medical treatment, it would have to be rejected.

Neither of the two statutory mechanisms was available to William Drabick. Under the Natural Death Act, only a "[q]ualified patient" can execute a binding directive to physicians. A "qualified patient" is one who has been "diagnosed and certified in writing to be afflicted with a terminal condition[33] by two physicians." (Health & Saf. Code, § 7187, subd. (e).) In addition, a qualified patient must undergo a waiting period of at least 14 days before

---

[33] A "terminal condition" under the Natural Death Act is "an incurable condition caused by injury, disease, or illness, which, *regardless of the application of life-sustaining procedures,* would, within reasonable medical judgment, produce death, and where the application of life-sustaining procedures serve only to postpone the moment of death of the patient." (Health & Saf. Code, § 7187, subd. (f), italics added.) Since William's physician has testified that he "could be maintained indefinitely" with a nasogastric tube and other treatment, it appears that his condition does not constitute a "terminal condition" as narrowly defined in the statute.

executing a binding directive. (Health & Saf. Code, §§ 7188, 7191, subd. (b).) After his accident, Drabick was no longer able to communicate at all, much less sign a binding directive. Before the accident, the only directive Drabick could have executed would have been merely advisory. (Health & Saf. Code, § 7191, subd. (c).) Nor did William have an opportunity to execute a durable power of attorney for health care, since the act authorizing them did not take effect until January 1, 1984, almost a year after William's accident. (Stats. 1983, ch. 1204, § 10.)[34]

Moreover, nothing in the language of the two statutes suggests that the Legislature intended either to be exclusive. Civil Code section 2500, which authorizes durable powers of attorney for health care, does not even address the question of exclusivity. In view of the fundamental nature of the right that is involved, we find it difficult to accept that the Legislature intended by implication to destroy the rights of the vast majority who do not execute such documents.

The Natural Death Act, on the other hand, *expressly* provides that it is not exclusive. Health and Safety Code section 7193 states that "[n]othing in this chapter shall impair or supersede any legal right or legal responsibility which any person may have to effect the withholding or withdrawal of life-sustaining procedures in any lawful manner. In such respect the provisions of this chapter are cumulative."[35]

This nonexclusivity provision makes it clear that the Legislature did not attempt to eliminate other mechanisms for exercising the fundamental right to determine one's own medical treatment. Indeed, choice in medical care decisions is not a privilege granted by the state and subject to waiver through technical omissions. To the contrary, the right in question is "exclusively" the conservatee's and one over which "neither the medical profession nor the judiciary have any veto power." (*Bouvia, supra,* 179

---

[34] Respondent suggests that William Drabick could validly have created a durable power of attorney for health care even before the enactment of the statutes expressly authorizing such documents. Even if this is true, however, we cannot accept the argument that such a power of attorney, which would have been the product of unusually creative drafting, became the exclusive mechanism for refusing medical treatment even before the Legislature addressed the subject.

[35] The court in *Bouvia, supra,* 179 Cal.App.3d 1127, relied on Health and Safety Code section 7193 to hold that a competent patient could direct the withdrawal of medical care without executing a Natural Death Act directive. (*Id.* at pp. 1139-1140.) The court viewed Health and Safety Code section 7193 as "[r]ecognition of the right of other persons who may not be terminally ill and may wish to give other forms of direction concerning their medical care." (*Id.* at p. 1139.) However, Health and Safety Code section 7193's language is even broader than that. The statute's reference to persons who have a "legal responsibility . . . to effect the withholding or withdrawal of life-sustaining procedures" applies to persons like conservators and physicians who must act in patients' best interests, and not just to patients, themselves.

Cal.App.3d at p. 1135.) As the court in *Bouvia* stated, "[t]he right to refuse treatment does not need the sanction or approval [of] any legislative act, directing how and when it shall be exercised." (179 Cal.App.3d at p. 1139-1140.) The *Bouvia* court's statement has firm authority in *Cobbs* v. *Grant, supra,* 8 Cal.3d 229, which recognizes each individual's right to give or to refuse consent, and in the legislative findings that accompany the Natural Death Act. In Health and Safety Code section 7186, the Legislature found that "adult persons have the fundamental right to control the decisions relating to the rendering of their own medical care, including the decision to have life-sustaining procedures withheld or withdrawn in instances of a terminal condition." (Health & Saf. Code, § 7186.) The court in *Barber, supra,* considered this finding sufficient authority for the conclusion that the Natural Death Act "does not represent the exclusive basis for terminating life-support equipment in this state." (147 Cal.App.3d at p. 1016.)

In summary, neither the Natural Death Act nor Civil Code section 2500 provided a mechanism for William Drabick to exercise his right to determine the scope of his own medical care under the circumstances of this case. To hold that these statutes are exclusive would be, in effect, to deny him that right. For that reason, and because there is no evidence that the Legislature intended this result, we cannot accept the state public defender's argument.

## IV. DISPOSITION AND FURTHER PROCEEDINGS

The decision of the superior court is reversed and the case is remanded for further proceedings, if any are necessary, in accordance with this opinion and the following directions.

■ Under Probate Code 2355, subdivision (a), the conservator was not required to seek judicial approval before withholding consent to further treatment of a conservatee in a persistent vegetative state. Because we reverse the superior court's decision, the conservator remains free to act under Probate Code section 2355. Thus, further proceedings will be necessary only if the conservator chooses to seek approval by pursuing his petition or if another interested person challenges his decision. (Prob. Code, § 2359, subd. (a).)

If the conservator or any other interested person does invoke judicial supervision, the court's role will be limited to determining whether the conservator's decision complies with Probate Code section 2355, subdivision (a). As discussed above, the section requires a conservator to decide (1) based upon medical advice (2) whether treatment is necessary; section 2355 also requires a decision made (3) in good faith.

The medical advice that will support a conservator's decision to forego life-sustaining treatment must include the prognosis that there is no reasonable possibility of return to cognitive and sapient life.[36] "When dealing with patients for whom the possibility of full recovery is virtually nonexistent, and who are incapable of expressing their desires," this prognosis is " 'the focal point of decision.' " (*Barber, supra,* 147 Cal.App.3d at p. 1019, quoting from *Matter of Quinlan, supra,* 355 A.2d at p. 669.) However, such a prognosis does not compel the conservator to forego life sustaining treatment. Instead, based on the medical advice, Probate Code section 2355 still requires the conservator to make a good faith decision whether treatment is necessary.[37]

The concept of good faith precludes a decision affected by a material conflict of interest.[38] Good faith also requires the conservator to consider the available information relevant to the conservatee's best interests. For example, if the available information included a binding directive under the Natural Death Act, the conservator would be statutorily bound by the instructions contained in the directive.[39] If the available information included a nonbinding directive under the Natural Death Act or other informal

[36] This opinion's reasoning is predicated upon its subject being a patient for whom there is no reasonable hope of a return to cognitive life. We have not considered any other case, and this opinion would not support a decision to forego treatment if this factual predicate could not be satisfied.

[37] Thus, nothing in the Probate Code excludes the possibility that a conservator, faced with a hopeless prognosis, will nevertheless decide to continue life-sustaining treatment.

[38] David Drabick, the conservator, testified in the superior court that he was the beneficiary of a $40,000 life insurance policy covering William Drabick, the conservatee. David Drabick also testified that he planned to use any proceeds to establish a trust for his nieces' and nephews' education.

While it is hard to avoid the conclusion that this financial interest is logically relevant to the conservator's good faith, it does not follow that this interest would compel the superior court to disapprove the petition or, more appropriately, to appoint a new conservator. Conservators will often be chosen from the conservatee's immediate family, since family members are most likely to appreciate the conservatee's personal values. Indeed, designated family members are entitled to preference under Probate Code section 1812, subdivision (b). Since immediate family members are likely to have some testamentary or beneficial interest, an inflexible rule in this area would often eliminate those persons most qualified to serve as conservators.

However, a financial interest need not disqualify a potential conservator in all cases, since the Probate Code expressly gives the appointing court discretion. Unless the conservatee has designated his or her own conservator (Prob. Code, § 1800), "the selection of a conservator of the person . . . is solely in the discretion of the court and, in making the selection, the court is to be guided by what appears to be the best interests of the proposed conservatee." (Prob. Code, § 1812, subd. (a).) We note that there has been no challenge to David Drabick's appointment.

[39] Probate Code 2356, subdivision (e), provides: "This chapter [including section 2355] [is] subject to any valid and effective directive of the conservatee under Chapter 3.9 (commencing with Section 7185) of Part I of Division 7 of the Health and Safety Code (Natural Death Act)."

indications of the conservatee's wishes, good faith would require the conservator to consider such information as a factor in the decision. In this case, William's prior statements about medical care are one factor indicating that the decision to forego treatment is consistent with his best interests. While these informal statements do not compel either granting or denying the petition, the conservator may rely upon them to show that he has considered William's best interests in good faith.

■ Life-sustaining treatment[40] is not "necessary" under Probate Code section 2355 if it offers no reasonable possibility of returning the conservatee to cognitive life and if it is not otherwise in the conservatee's best interests, as determined by the conservator in good faith.

The decision is reversed.

Brauer, J., and Stone, J.,* concurred.

A petition for a rehearing was denied May 12, 1988, and respondent's petition for review by the Supreme Court was denied July 28, 1988. Broussard, J., was of the opinion that the petition should be granted.

---

[40]Medical procedures for hydration and nutrition are medical treatment. See footnote 9, *ante*.

*Assigned by the Chairperson of the Judicial Council.