NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports.  Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us.  Opinions are available on the Internet by 9:00 a.m. on the morning of their release.  The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

6th Circuit Court-Concord Probate Division
No. 2018-0701

IN RE GUARDIANSHIP OF L.N.

Argued: October 10, 2019
Opinion Issued: February 19, 2020

Richard G. Anderson Law Offices, PLLC, of New London (Richard G. Anderson on the brief and orally), for the respondent.

Primmer Piper Eggleston & Cramer PC, of Manchester (Doreen F. Connor on the brief), for Concord Hospital, as amicus curiae.

Risa Evans and John Greabe, University of New Hampshire, Franklin Pierce School of Law, of Concord (Ms. Evans and Mr. Greabe on the brief, and Ms. Evans orally), for The Warren B. Rudman Center for Justice, Leadership & Public Service, as amicus curiae.[1]

---

[1] The University of New Hampshire School of Law Rudman Center filed an amicus curiae brief in support of the decision of the trial court in response to our invitation.  See Mata v. Lynch, 135 S. Ct. 2150, 2154 (2015) (where parties were in agreement on legal issue, amicus curiae was appointed to defend the appealed decision).

HICKS, J.  The respondent, L.N., appeals an order of the Circuit Court (Moran, J.) denying a motion to authorize removal of life support filed by her guardian.  We reverse the order denying authority to remove life support and vacate, in part, the order appointing the guardian.

The trial court found, or the record supports, the following facts.  On September 12, 2018, L.N. was transported to Concord Hospital after having been found unresponsive in her home.  Tests indicated that L.N. had suffered a stroke.  The court found that L.N., who was 69 years old at the time of the orders on appeal, had "enjoyed a full, active, independent life" prior to her stroke on September 12.  Thereafter, L.N. remained in the hospital on a ventilator to assist with breathing and a nasal-gastric tube for nutrition and hydration.  L.N.'s attorney informed the court in a motion for expedited hearing that "[a]fter consulting with personnel, it has been indicated that [L.N.] will probably not survive the massive stroke which precipitated this hospitalization, but there is no one with authority to act."  There was no evidence that L.N. had previously executed either a living will or a durable power of attorney for healthcare.  See RSA 137-J:20 (2015).

Two petitions for guardianship over the person of L.N. were filed — one by a close friend, G.H., and a second by L.N.'s friend and former employer, M.C.  The court was advised that L.N. had only one known living relative, a nephew who had informed the hospital that he could not serve as L.N's guardian.

After a hearing, the court found, beyond a reasonable doubt, that L.N. was incapacitated and in need of a guardian over her person and estate.  See RSA 464-A:9, III (2018).  The court issued an order appointing M.C. (the guardianship order).  Noting that all parties had requested a decision on whether the guardian should be granted authority to remove life-sustaining treatment from L.N., the court deferred ruling on that issue until after further hearing.  The court scheduled an expedited hearing to address whether the guardian "should be awarded authority to remove life-sustaining treatment" and the guardianship order specifically stated that "[t]he guardian does NOT have the authority to remove life sustaining treatment.  A further hearing will be scheduled to address that issue and a written order will issue thereafter." (Bolding omitted).

At the subsequent hearing, held on October 17, the court heard testimony from the guardian and three professionals from the hospital: Dr. Alejandro Saranglao, a pulmonary critical care specialist; Dr. Maureen Hughes, a neurologist; and Adeline Camelio, a social worker.

Dr. Saranglao testified that L.N. was not "show[ing] any signs of higher cortical functions, awareness," and he did not think she had any realistic

2

possibility of a meaningful recovery. The "most positive outcome" in L.N.'s case, according to Dr. Saranglao, "would be persistent vegetative state."

Dr. Hughes testified that L.N. had suffered a bilateral ischemic stroke, which would tend, among other things, to "affect[] the nerves that maintain consciousness." She stated that L.N. could spontaneously blink, open her eyes and grimace, but that she was not reacting to her environment or communicating at even the most basic level. Dr. Hughes further opined that L.N. was unlikely to regain that function. She testified that the damage to L.N.'s brain was irreversible, and that, without L.N.'s ability to communicate, the doctors had no ability to employ rehabilitation. Finally, Dr. Hughes testified that there was no dissension among the physicians at the hospital as to the appropriate treatment in this case, and that, in the previous week, Hospital neurologists "evaluat[ed] [L.N.'s] case as presented . . . by the neurologist who'd seen her most recently and the MRI reports, and [they were] all in agreement that it's a very poor prognosis for neurologic recovery."

The guardian, who testified that she had known L.N. for approximately 30 years and worked with her for 18 years, indicated that while L.N. never made a specific statement about her own end-of-life preferences, the two had had "very plain, open conversations" about the subject when people they knew had been dealing with end-of-life situations. Based upon those conversations, the guardian's sense was that L.N. "would want to be allowed to have a natural death."

At the conclusion of the hearing, the court requested that the Hospital provide relevant medical records including MRIs and CT scans that had been performed on L.N. The court also requested an opinion from the Hospital's ethics committee.

After receiving the requested documents, the court issued an order on October 22, 2018. The court concluded that the authority granted by statute to a guardian over the person "does not include the authority to remove a ward from life support without Court approval." The court also found "that a question remains at this time as to whether there is likelihood that [L.N.] would regain an ability to react to her environment, communicate, or have any degree of independent function" and, therefore, concluded that it was in L.N.'s best interests "to stay a decision on giving the guardian the authority to withdraw life sustaining treatment for an additional 20 days, to provide the Court with additional information over a 60-day post-incident period to see if there is any further improvement by [L.N.]." The court ordered the Hospital to provide neurological consult notes for the period from October 17, 2018, through November 7, 2018, and the results of any further MRIs or EEGs.

On November 19, 2018, the court issued its further order on the motion to authorize removal of life support. The court first "presume[d] that [L.N.]

3

would have directed her healthcare providers to provide her with resuscitation, hydration and nutrition to a degree sufficient to sustain her life, subject to scenarios where the presumption would not apply." The court then found that "it has not been shown by clear and convincing evidence that [L.N.] would have rejected artificial nutrition and hydration and resuscitation. It has also not been shown by clear and convincing evidence that [L.N.] is in a permanent vegetative state or that her movements are only reflexive." The court concluded that, "in cases of doubt, the Court must assume that the patient would choose to defend life" and did "not find that [L.N.] — under the facts in this case — would choose to have life support removed and a natural death process to occur."

The guardian moved the court to reconsider. She stated that "[s]ince the last hearing, [L.N.'s] condition has stabilized. There has been no improvement, and some things have become worse with the passage of time, including her prognosis." The court scheduled a status conference to address the motion to reconsider, but subsequently cancelled the same and stayed further proceedings upon receiving notification that the instant appeal had been accepted.

On appeal, L.N. argues that the probate court erred in determining that "it had jurisdiction to make a determination as to the appropriateness, or lack thereof, of the removal of life support in the case of a patient who was in a persistent vegetative state" where "no party challeng[ed] the proposed removal." She further argues that, even if the court had the authority to exercise its discretion in this matter, its findings are unsupported by the testimony.

Our standard of review of a circuit court probate division decision is governed by statute: "The findings of fact of the judge of probate are final unless they are so plainly erroneous that such findings could not be reasonably made." RSA 567-A:4 (2019). Accordingly, "we will not disturb the probate division's decree unless it is unsupported by the evidence or plainly erroneous as a matter of law." Hodges v. Johnson, 170 N.H. 470, 480 (2017).

I. Issues on Appeal

Although L.N. appears, at times, to challenge the trial court's jurisdiction, she explicitly states that her "argument was, and remains, that there is simply no statutory basis for . . . a requirement" that her guardian obtain prior court approval to withdraw life-sustaining treatment. Accordingly, we read her argument not as a challenge to the trial court's subject matter jurisdiction, but rather, as a challenge to the court's statutory authority to impose such a requirement. This argument raises an issue of statutory interpretation, which is a question of law subject to de novo review. See Rogers v. Rogers, 171 N.H. 738, 743 (2019).

4

In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed by the words of the statute considered as a whole. We first look to the statutory language, and whenever possible construe that language according to its plain and ordinary meaning. We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. When the language of a statute is unambiguous, we do not look beyond it for further indications of legislative intent.

Id. (citations omitted).

RSA 464-A:25 provides in relevant part:

I. A guardian of an incapacitated person has the following powers and duties, except as modified by order of the court:
. . . .
(d) A guardian of the person may give any necessary consent or approval to enable the ward to receive medical or other professional care, counsel, treatment, or service or may withhold consent for a specific treatment, provided, that the court has previously authorized the guardian to have this authority, which authority shall be reviewed by the court as part of its review of the guardian's annual report. No guardian may give consent for psychosurgery, electro-convulsive therapy, sterilization, or experimental treatment of any kind unless the procedure is first approved by order of the probate court.

RSA 464-A:25, I(d) (2018). L.N. notes that RSA 464-A:25, I(d) explicitly lists "four specific categories of treatment" that require prior approval by the probate court, but "makes no mention whatsoever of life-sustaining treatment, life support, etc." She argues, therefore, that "there is simply no statutory basis" for requiring the guardian to obtain prior court approval for the withdrawal of life support.

The Warren B. Rudman Center for Justice, Leadership & Public Service, as amicus curiae (the Rudman Center), counters that while the omission of language concerning life-sustaining treatment in RSA 464-A:25, arguably "suggests that a probate court could, in its discretion, empower a guardian to authorize withdrawal of life-support without any further action by the court," it "does not require a probate court to grant such power to a guardian, or suggest that this power is automatic." Rather, the Rudman Center argues, "the scope of the guardian's power over life support is left to the probate court's sound discretion." It further notes that "the statute allows the court to limit a guardian's authority over life-support decisions, as the court did when it first appointed L.N.'s guardian." Specifically, RSA 464-A:25, II provides that "[t]he

5

court may limit the powers of the guardian of the person or impose additional duties if it deems such action desirable for the best interests of the ward." RSA 464-A:25, II (2018); see also RSA 464-A:25, I (Supp. 2019) (providing that "[a] guardian of an incapacitated person has the following powers and duties, except as modified by order of the court" (emphasis added)).

The Hospital, as amicus curiae, acknowledges the court's authority to limit a guardian's powers under RSA 464-A:25, II, but notes that the court did not base its order on that power but, rather, on "its erroneous belief that 'RSA 464-A:25 does not include the authority to remove a ward from life support without court approval.'" The Hospital argues that "[t]he Legislature's decision not to include life-sustaining treatment as [one of the] treatment[s] requiring Court approval [in RSA 464-A:25, I(d)] means [that] the authority over that decision automatically flows from the Guardian's appointment."

II. Analysis

We first agree with the Hospital that the court in this case did not base its decision on RSA 464-A:25, II. Rather, the court explicitly concluded that "[t]he statutory authority granted to a guardian over the person," under RSA 464-A:25, "does not include the authority to remove a ward from life support without Court approval." Accordingly, this case presents only the narrow issue of whether that conclusion was correct.

We have never ruled upon the issue now before us. In re Terry, 129 N.H. 111 (1986), presented questions, on interlocutory transfer, "asking whether there are circumstances in which [the probate court] would have authority under RSA 464-A:25 to authorize a guardian to order the removal of a nasogastric tube supplying food and water to the ward, a hospital patient described as living in a 'chronic vegetative state.'" In re Terry, 129 N.H. at 112. We declined to "consider the transferred questions without the benefit of the judge's comprehensive findings of fact, made after evidentiary hearing in open court." Id. We listed a number of questions, without limitation, that the court should address, including questions about the ward's prior competence; her expression of preference, if any, "about the application or withholding of procedures to sustain her life in the event she should become incompetent to accept or reject such procedures"; the ethical standards that physicians concerned with the case would apply in recommending for or against removal of the nasogastric tube; the effects of withdrawal on the ward, and her awareness, if any, of those effects; in the event of withdrawal, what medical care would be extended to the patient; the financial consequences to various interested parties; and, if the nasogastric tube were not withdrawn, what would be "the prognosis and who [would] bear the cost of [the ward's] maintenance." Id. at 112-13. We further instructed that "[t]he trial court should explicitly indicate whether it makes each finding on these or other subjects to the degree

6

of a preponderance of the evidence, to a clear and convincing degree, or to some other degree of relative certainty." Id. at 113.

We note that in the instant case, the trial court made findings on each of the questions set forth in Terry and "[a]pplying the Terry factors, the Court [found] that the guardian has not proven by clear and convincing evidence that the Guardian's Motion for Authority to Remove the Ward from Life Support [should] be granted." While we do not fault the trial court for seeking guidance in our only published decision on the subject of end-of-life decision-making for an incompetent ward, we point out that Terry is a nonprecedential decision of this court that did not establish factors or standards to be applied in future cases. Rather, in a three-page memorandum opinion citing no law, we "respectfully decline[d] the interlocutory transfer," noting that "the stipulated factual basis for the transfer [was] too tentative and incomplete to demonstrate that the circumstances of the case actually raise those questions." Id. at 112. We set forth a non-exhaustive list of findings for the court to make about the particular ward in that case and stated that "[a]fter the probate court has made such findings, we will stand ready to consider whether to accept any renewed request for interlocutory transfer of questions of law." Id. at 113. Accordingly, Terry set no precedent, and we now write on a clean slate.

A. A Guardian's Authority Under RSA 464-A:25, I(d)

Under RSA 464-A:25, I, "except as modified by order of the court," a guardian of an incapacitated person has the powers and duties specified in, among other provisions, subparagraph d. RSA 464-A:25, I. We conclude that the language "except as modified by order of the court," RSA 464-A:25, I, refers to the court's authority under RSA 464-A:25, II to limit the guardian's powers "if it deems such action desirable for the best interests of the ward," RSA 464-A:25, II. We further conclude that the language "provided, that the court has previously authorized the guardian to have this authority," RSA 464-A:25, I(d), does not contemplate a separate and explicit authorization for the specific medical treatment or procedure at issue; rather, it simply means that the court, having found the ward incapacitated due to a functional limitation impairing the ward's ability to secure and maintain healthcare for himself or herself, grants the guardian the general authority to make healthcare decisions for the ward. See RSA 464-A:2, VII, XI (2018), :9 (2018); see also In the Matter of Salesky & Salesky, 157 N.H. 698, 703 (2008) (interpreting order appointing co-guardians such that the rights removed from the ward due to his incapacity to exercise them "were the very powers and authorities conferred, and the duties and obligations imposed upon the co-guardians" (quotation omitted)). Accordingly, unless the court imposes a limitation under RSA 464-A:25, II, a guardian who has been granted authority to make healthcare decisions for a ward, who is incapacitated to make his or her own such decisions, possesses the general authority described in RSA 464-A:25, I(d). We now examine

7

whether such general authority includes the authority to terminate life support for a ward in appropriate circumstances. We conclude that it does.

Except with respect to the specifically-excepted procedures, RSA 464-A:25, I(d), like the conservatorship statute at issue in Conservatorship of Drabick, 245 Cal. Rptr. 840 (Ct. App. 1988), superseded by statute as noted in Conservatorship of Wendland, 28 P.3d 151, 166 (Cal. 2001), "confers authority in broad terms without distinguishing between relatively minor and relatively major decisions." Drabick, 245 Cal. Rptr. at 850–51. In Drabick, the court expressly rejected a prior opinion of the attorney general that had concluded "[a] California superior court lacks jurisdiction to order or approve the withholding or withdrawal of extraordinary life support systems or procedures from a person made a ward or conservatee pursuant to the Probate Code." Id. at 850 (quotation omitted). The Drabick Court concluded that "a conservator [who] already has power under [California Probate Code] section 2355 to make medical treatment decisions" may decide to withdraw artificial life support from the ward without "need for judicial approval absent a disagreement among the interested persons." Id. at 850, 852.

Other jurisdictions have similarly interpreted general provisions in their guardianship or conservatorship statutes, particularly those empowering the guardian or conservator to make medical decisions for a ward, as empowering the guardian or conservator to withdraw life-sustaining treatment in appropriate circumstances. See, e.g., In re Estate of Longeway, 549 N.E.2d 292, 298 (Ill. 1989) (finding that where statute "specifically permits a guardian to make provisions for her ward's support, care, comfort[,] health, education and maintenance," it "impliedly authorizes [the] guardian to exercise the right to refuse artificial sustenance on her ward's behalf" (quotation omitted)); In re Guardianship of Tschumy, 853 N.W.2d 728, 742, 742 n.12 (Minn. 2014) (holding that plain language of statute "giv[ing] guardians the power to give any necessary consent to enable the ward to receive necessary medical or other professional care, counsel, treatment, or service" authorized guardian in that case "to consent to the discontinuation of [the ward's] life-sustaining treatment" (quotation omitted)); Matter of Guardianship of Hamlin, 689 P.2d 1372, 1378 (Wash. 1984) (reaffirming that the statutory "duties of [a] guardian . . . to assert the rights and best interests of the incompetent person . . . include[] the power to assert the incompetent's personal right to refuse life sustaining treatment" (quotation omitted)); see also Rasmussen by Mitchell v. Fleming, 741 P.2d 674, 687, 688, 689 (Ariz. 1987) (en banc) (concluding that statute providing that "a guardian may give any consents or approvals that may be necessary to enable the ward to receive medical or other professional care, counsel, treatment or service" gave the guardian "the implied, if not express, statutory authority to exercise [the ward's] right to refuse medical treatment," including placing do not resuscitate or hospitalize orders on ward's medical chart (quotation omitted)).

In addition to RSA 464-A:25, I(d)'s broad and unqualified grant of authority as to medical treatment other than the four specifically excluded treatments, we find RSA 464-A:25, I(e) instructive in concluding that end of life decisions are included in a guardian's power under RSA 464-A:25, I(d). Subparagraph (e) provides:

> If a ward has previously executed a valid living will, under RSA 137-J, a guardian shall be bound by the terms of such document, provided that the court may hold a hearing to interpret any ambiguity in such document. If a ward has previously executed a valid durable power of attorney for health care, RSA 137-J shall apply.

RSA 464-A:25, I(e).

> As defined in RSA 137-J:2, XIV, a living will is:
> a directive which, when duly executed, contains the express direction that no life-sustaining treatment be given when the person executing said directive has been diagnosed and certified in writing by the attending physician or APRN to be near death or permanently unconscious, without hope of recovery from such condition and is unable to actively participate in the decision-making process.

RSA 137-J:2, XIV (2015).

By binding the guardian to the ward's express directives as to life-sustaining treatment, RSA 464-A:25, I(e) implies that the guardian has the authority to make decisions in that regard on behalf of the ward. The Illinois Supreme Court reached a similar conclusion with respect to a provision of the Illinois Powers of Attorney for Health Care Law that would have allowed the ward to "authorize her agent to terminate the food and water that sustain her" and a Probate Act providing that, if a ward has such a healthcare agency in force, "the guardian has no power, duty or liability with respect to any health care matters covered by the agency." In re Estate of Longeway, 549 N.E.2d at 298 (quotation and ellipsis omitted)). The court reasoned:

> Logically, the legislature would not have prohibited the guardian from usurping the authority of an agent acting under a health care power of attorney, if the guardian could not have exercised the agent's powers in the first place. Thus, if only an agent can terminate food and water under a power of attorney, the Probate Act would not have precluded a guardian from interfering with this prerogative, unless the guardian also would have this power.

Id.

9

For the foregoing reasons, we conclude that the general power to give or withhold consent to medical treatment under RSA 464-A:25, I(d) includes the power to withdraw life-sustaining treatment in appropriate circumstances. We now turn to the question whether a guardian must obtain prior court approval to exercise that power.

As other courts addressing end-of-life decision-making for incompetent patients have observed, "[c]ourts are not the proper place to resolve the agonizing personal problems that underlie these cases," Matter of Jobes, 529 A.2d 434, 451 (N.J. 1987), and "the judicial process [is] an unresponsive and cumbersome mechanism for decisions of this nature," Matter of Welfare of Colyer, 660 P.2d 738, 746 (Wash. 1983) (en banc); see also Matter of Guardianship of L.W., 482 N.W.2d 60, 75 (Wis. 1992) (citing Matter of Welfare of Colyer and Matter of Jobes). The Kentucky Supreme Court has concluded that "it would be logistically impossible to require court approval of every decision to withhold or withdraw life-prolonging treatment." Woods v. Com., 142 S.W.3d 24, 49 (Ky. 2004).

We agree with the view that the legal process is a "cumbersome mechanism" for resolving end-of-life decisions in circumstances like those presented here. Matter of Welfare of Colyer, 660 P.2d at 746. Moreover, we conclude that under the plain language of RSA 464-A:25, I(d), judicial involvement is not required. As L.N. points out, RSA 464-A:25, I(d) explicitly lists "four specific categories of treatment" that require prior approval by the probate division, but "makes no mention whatsoever of life-sustaining treatment, life support, etc." Therefore, L.N. argues, requiring prior court approval for the cessation of life-sustaining treatment would impermissibly add words to the statute that the legislature did not see fit to include. See Rogers, 171 N.H. at 743. We agree.

A requirement that a guardian seek prior court approval for any and all end-of-life decisions for the ward cannot be found in the guardianship statute, and we will not rewrite the statute to include such a requirement. See id. Furthermore, the inclusion of a prior approval requirement for four specific types of treatment strongly indicates that the legislature did not intend to require prior approval for any other procedures not mentioned. See Appeal of Cover, 168 N.H. 614, 622 (2016) (rejecting interpretation of statute that would both add words to the statute and "contravene the familiar axiom of statutory construction, expressio unius est exclusio alterius: Normally the expression of one thing in a statute implies the exclusion of another" (quotation omitted)). We note that the Supreme Court of Minnesota construed similar statutory language as "confirm[ing] that the Legislature did not intend that guardians come back to court to receive specific court permission to consent to the removal of a ward's life support." In re Guardianship of Tschumy, 853 N.W.2d at 744.

10

> The plain language of the statute supports the opposite conclusion. This is so because where the Legislature intended specific court approval for certain types of treatment, the Legislature expressly provided for that approval in the statute. <u>See</u> Minn. Stat. § 524.5–313(c)(4)(i) (requiring specific court approval "for psychosurgery, electroshock, sterilization, or experimental treatment of any kind").

<u>Id</u>.

As to what might constitute "appropriate circumstances" under which a guardian could authorize withdrawal of life-sustaining treatment for a ward, we note that most jurisdictions addressing the issue of end-of-life decision-making for incompetent patients have employed a substituted judgment approach, a best interests approach, or some combination or variation of the two. <u>See</u> <u>In re Estate of Longeway</u>, 549 N.E.2d at 299; <u>see also</u> <u>Matter of Conroy</u>, 486 A.2d 1209, 1231-32 (N.J. 1985) (adopting, in addition to a substituted judgment approach, "two 'best interests' tests—a limited-objective [and] a pure-objective test"). "Under substituted judgment, a surrogate decisionmaker attempts to establish, with as much accuracy as possible, what decision the patient would make if he were competent to do so." <u>In re Estate of Longeway</u>, 549 N.E.2d at 299. Under the best-interests approach, "a surrogate decisionmaker chooses for the incompetent patient which medical procedures would be in the patient's best interests." <u>Id</u>. The trial court in this case appears to have implemented a substituted-judgment approach, denying the motion to authorize removal of life support on the ultimate ground that it did "not find that [L.N.] — under the facts in this case — would choose to have life support removed and a natural death process to occur."

We need not decide which standard might apply in a case where the guardian's decision is challenged and court involvement in the decision is warranted; in this case, the trial court noted that "no person spoke in opposition to the removal of life support" at the October 17 hearing. We leave for another day the question whether substituted judgment, best interests, or some other standard applies to a guardian's decision to withhold life-sustaining treatment from a ward. We have recognized, however, that "a guardian stands in a fiduciary relationship to his ward," <u>In re Guardianship of Richard A.</u>, 124 N.H. 474, 478 (1984); <u>see also</u> <u>Wentworth v. Waldron</u>, 86 N.H. 559, 561 (1934), and we note that the established standards governing fiduciaries apply to guardians in cases like the one before us. For instance, a guardian, as a fiduciary, has the duty "to act primarily for [the ward's] benefit," <u>Appeal of Concerned Corporators of Portsmouth Sav. Bk.</u>, 129 N.H. 183, 203 (1987) (quotation omitted), and in good faith, <u>see</u> <u>id</u>. at 204 (noting that a fiduciary relationship "exist[s] in cases where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence" (quotation omitted)). As observed by the California Court of Appeals, the good faith standard in this context "precludes a decision affected by a material

11

conflict of interest" and "requires the [guardian] to consider the available information relevant to the [ward's] best interests." Conservatorship of Drabick, 245 Cal. Rptr. at 861. In sum, "[t]he standard of care [required of a fiduciary] is a high one indeed." Appeal of Concerned Corporators of Portsmouth Sav. Bk., 129 N.H. at 203.

The Rudman Center suggests that, under the approach we adopt today, "[e]very guardian of the person would have power to authorize withdrawal of life support, regardless of the reason for the guardianship, and even in cases where a ward has no current medical issues and has expressed no preferences with respect to life support," a proposition that "seems absurd." We observe that many courts resolving cases similar to the one now before us have expressly or implicitly limited their holdings to specific factual scenarios or required specific safeguards on the guardian's decision-making. Generally, the limitation restricts the holding at issue to patients/wards in a persistent vegetative state and the safeguards require the statement of two or more physicians confirming that the patient/ward is in such a state and has "no reasonable chance of recovery to a cognitive and sentient life." Matter of Guardianship of L.W., 482 N.W.2d at 72; see, e.g., id. at 63, 72, Matter of Jobes, 529 A.2d at 448; In re Fiori, 652 A.2d 1350, 1351 (Pa. Super. Ct. 1995).

We decline to impose any such limitation where the legislature has not done so. See Rogers, 171 N.H. at 743 (we will not add words to a statute that the legislature has not seen fit to include). We acknowledge that in some cases from other jurisdictions, the court-imposed limitations achieved the explicit purpose, or had the incidental effect, of avoiding potential constitutional issues. See, e.g., In re Estate of Longeway, 549 N.E.2d at 301 (noting that "if the surrogate decisionmaker is a court-appointed guardian, procedural due process questions involving deprivation of life may arise"); Woods, 142 S.W.3d at 42 (limit imposed "[t]o preclude the possibility of . . . an unconstitutional application" of the statute). In the instant case, neither L.N. nor either amicus raised or briefed any constitutional issue. However, when two doctors testified that L.N. shows only basic brainstem function and has no reasonable hope of recovery, the conditions other courts have imposed appear to be met. To the extent the trial court made factual findings to the contrary, we address that issue below. We decline to address potential constitutional issues that may arise in future cases, particularly in the absence of briefing.

A guardian's authority under RSA 464-A:25, I(d) is neither granted nor exercised without safeguards. As the Washington Supreme Court reasoned:

> In giving the guardian the authority to make . . . a judgment [to refuse life-sustaining treatment for the ward], we are aware of the danger that a guardian might act on the basis of less than worthy motives, i.e., an interest in the incompetent's estate or a desire to alleviate the financial burden of the life sustaining

treatment.  We believe, however, that safeguards exist within the laws controlling guardianships which protect against such dangers without requiring routine court intervention in the termination decision itself.  For example, a guardian of an incompetent is appointed by the . . . court and is at all times under the general direction and control of the court.

Matter of Welfare of Colyer, 660 P.2d at 747; cf. RSA 464-A:4 (2018) (detailing procedure for court appointment of guardian of incapacitated person) :35 (2018) (requiring guardian of the person to file annual report with court).

A guardian's decision to remove life support would also require implementation by medical personnel, who operate under their own set of legal, as well as professional and ethical, constraints.  See, e.g., RSA ch. 329 (2017 & Supp. 2019) (regarding the regulation of physicians and surgeons).  As the Supreme Court of New Jersey noted:

Physicians and other health-care personnel are under an ethical, moral, and legal duty to act in good faith and not to deviate from approved medical standards.  Physicians who do not adhere to these rules and standards open themselves to potential civil and criminal liability.  This fear of liability is substantial, see, e.g., In re Barber, 147 Cal.App.3d 1006, 195 Cal.Rptr. 484 (Cal.Ct.App. 1983) (Two doctors who acceded to the requests of family of patient in persistent vegetative state by removing his respirator and feeding tube were charged with murder and conspiracy to commit murder.), and should operate to ensure that the procedures we establish today will be followed.

Matter of Jobes, 529 A.2d at 448 n.15.

As the foregoing indicates, we are not alone in rejecting the proposition that a guardian must in all cases seek court approval before authorizing the withdrawal of life support from the ward.  See, e.g., Rasmussen, 741 P.2d at 679-80, 691 (concluding, in case addressing guardian's authority to refuse medical treatment, including resuscitation, for a ward in chronic vegetative state, that "[w]here . . . all affected parties concur in the proposed plan of medical treatment, court approval of the proposed plan of medical treatment is neither necessary nor required"); Woods, 142 S.W.3d at 50 (concluding that "[i]f the surrogate, as here, is a judicially-appointed guardian, and the physicians, family and ethics committee agree with the guardian's decision, there is no need to seek court approval"); In re Fiori, 652 A.2d at 1352 (holding "that no legal proceedings are necessary in the great majority of cases involving the termination of life sustaining treatment to persons in [the instant patient's] condition," namely, a persistent vegetative state); Matter of Welfare of Colyer, 660 P.2d at 747 (concluding that "the decision to refuse life sustaining

13

treatment is one that falls under the general powers of the guardian and does not routinely require a court order"); Matter of Guardianship of L.W., 482 N.W.2d at 63 (holding that a court-appointed guardian "does not need the prior authority of the court" to consent to withdrawal of medical treatment, including artificial nutrition and hydration, to ward in a persistent vegetative state).

The foregoing does not imply, however, that court involvement is never necessary or appropriate.  Recourse to the probate division may be had, and judicial intervention would be warranted, "[i]f a disagreement arises among the patient, family, guardian, or doctors, or if there is evidence of improper motives or malpractice."  Matter of Jobes, 529 A.2d at 451; see also In re Guardianship of Tschumy, 853 N.W.2d at 748 (clarifying that nothing said in the "opinion should be viewed as prohibiting any interested family member or employee of the hospital or other health care facility from looking to the courts if there is a dispute over what is in the ward's best interest").

We conclude that the general power to give or withhold consent to medical treatment under RSA 464-A:25, I(d) includes the power to withdraw life-sustaining treatment, in appropriate circumstances, without prior court approval.  We reverse the trial court's legal conclusion to the contrary.  The trial court found that "[a]t the October 17, 2018 hearing, no person spoke in opposition to the removal of life support."  Under our interpretation of RSA 464:25, I(d) set forth above, we conclude that where there was no disagreement among the guardian, L.N.'s attorney, or the Hospital as to the proper course of action, the trial court's involvement in the decision was neither necessary nor warranted.

We acknowledge the Rudman Center's observation that "the parties invited and acquiesced to the court's" involvement.  We will not, however, fault the guardian for seeking guidance from the court, and are not persuaded by the Rudman Center's suggestion that L.N. "[a]rguably . . . waived" certain issues through such acquiescence.  Cf. Conservatorship of Drabick, 245 Cal. Rptr. at 845 (noting that "it would be perverse to hold that an otherwise lawful course of action has been frustrated simply because the parties came to court in advance to obtain some certainty about their rights and obligations").

B.  The Guardian's Authority in this Case

We have concluded that the trial court erred as matter of law when it ruled that the statutory authority of a guardian over the person "does not include the authority to remove a ward from life support without Court approval."  We now examine the trial court's rulings in light of our interpretation of RSA 464-A:25, I(d).

The trial court found that L.N. was incapable of exercising the right, among others, to "[r]efuse or consent to medical or other professional care,

14

counseling, treatment or service, including the right to be admitted or discharged from any hospital or other medical institution providing such at the lawful direction of the guardian of the person." The court therefore granted the guardian the "right and authority to determine if refusal should be made or consent should be given to any medical or other professional care, counseling, treatment, or service," subject to the statutory limitations on placement in the New Hampshire Hospital or similar state institution, and consents to psychosurgery, electroshock therapies, sterilization, or "other experimental or extraordinary treatment or procedure." In addition, the order appointing the guardian provided that "[t]o the extent not otherwise encompassed within the foregoing, the guardian of the person shall have all of the rights, powers and authorities set forth in RSA 464-A:25."

Without more, the foregoing constitutes a general grant of authority that includes the authority under RSA 464-A:25, I(d) to withdraw life-sustaining treatment in appropriate circumstances. The guardianship order also, however, preliminarily withheld the authority to remove life-sustaining treatment pending a "further hearing . . . to address that issue." (Bolding omitted). We will assume, without deciding, that the court's authority to limit a guardian's powers under RSA 464-A:25, II includes such authority to preliminarily withhold a power otherwise granted under RSA 464-A:25, I(d), so that the court may hear evidence to determine whether limiting that power would be "desirable for the best interests of the ward." RSA 464-A:25, II; see Salesky, 157 N.H. at 704 (noting that "[t]he only limitation upon the probate court's authority to impose additional duties upon a guardian is that the duties be 'desirable for the best interests of the ward'").

It appears, however, that the trial court neither held the hearing, nor utilized the evidence, for that purpose; rather, the court appears to have acted throughout the proceedings on the erroneous premise that the guardian required its prior approval to discontinue life support. For instance, the court scheduled the expedited hearing to address whether the guardian "should be awarded authority to remove life-sustaining treatment." (Emphasis added.) Thereafter, the court explicitly stated that the statutory authority of a guardian over the person "does not include the authority to remove a ward from life support without Court approval."

The court never made a finding that limiting the guardian's power to terminate life support would be "desirable for the best interests of [L.N.]," RSA 464-A:25, II (emphasis added). Rather, using a substituted judgment approach, the court purported to withhold authority from the guardian to terminate L.N.'s life-sustaining treatment because it did "not find that [L.N.] — under the facts in this case — would choose to have life support removed and a natural death process to occur." Ultimately, then, in proceeding under the erroneous legal conclusion that RSA 464-A:25, I(d) did not empower any guardian to remove a ward's life support without prior court approval, the

15

court did not limit the powers of the underline particular guardian in this case under RSA 464-A:25, II.

Because any limitation on the guardian's RSA 464-A:25, I(d) authority after the October 17 hearing was not supported by the statutorily-required finding that it was "desirable for the best interests of [L.N.]," RSA 464-A:25, II, we vacate that limitation. Without that limitation, the guardianship order's grant of the "right and authority to determine if refusal should be made or consent should be given to any medical or other professional care, counseling, treatment, or service" constitutes a general grant of authority that includes the authority to withdraw life-sustaining treatment in appropriate circumstances. Accordingly, the guardian "may give any necessary consent or approval to enable [L.N.] to receive medical or other professional care, counsel, treatment, or service or may withhold consent for a specific treatment," including life-sustaining treatment, but excluding "psychosurgery, electro-convulsive therapy, sterilization, or experimental treatment of any kind," without prior court approval. RSA 464-A:25, I(d).

The guardian must make any such decision in good faith and, as specified in the guardianship order, "[t]he guardian will share all medical information with [L.N.'s close friend, G.H.] and will consult with her on major medical decisions," including the removal of life support. (Bolding omitted). The ultimate decision-making authority, however, resides in the guardian. If the Hospital, any physician, or any other interested person challenges the guardian's decision, recourse may be had to the circuit court probate division. Otherwise, except with respect to any reporting or accounting required under the guardianship statute, see, e.g., RSA 464-A:35, :36 (2018), no further judicial involvement is necessary. Cf. Conservatorship of Drabick, 245 Cal. Rptr. at 860 (directing that "further proceedings will be necessary only if the conservator chooses to seek approval by pursuing his petition or if another interested person challenges his decision").

Finally, although we reverse the trial court's decision for legal error, we address a factual finding — challenged on appeal — that might appear to contradict one of the premises upon which we declined to consider any constitutional issues in this case. Specifically, we noted that the conditions other courts have imposed to avoid constitutional issues appear to be met in this case, where two doctors testified that L.N. shows only basic brainstem function and has no reasonable hope of recovery.

In its October 22 order, however, the trial court found "that a question remains at this time as to whether there is likelihood that [L.N.] would regain an ability to react to her environment, communicate, or have any degree of independent function." The Hospital argues that this finding is plainly erroneous and was "based upon an impermissible lay interpretation of [L.N.'s] neurology medical records." Although the severity and permanence of L.N.'s

condition is certainly relevant to the decision to withdraw life-sustaining treatment, we find it unnecessary to determine whether the trial court's factual finding was plainly erroneous. More than a year has passed since the court made that finding. Additional medical information as to L.N.'s condition and prognosis presumably has become available in the intervening time. The guardian will undoubtedly consider that additional medical information in making any decision under RSA 464-A:25, I(d). See id. at 861 (noting that the good faith standard in this context "requires the conservator to consider the available information relevant to the conservatee's best interests").

Order denying authority to remove life<br>support reversed; order appointing<br>guardian vacated in part.

BASSETT and DONOVAN, JJ., concurred; HANTZ MARCONI, J., concurred in part and dissented in part.

HANTZ MARCONI, J., concurring in part and dissenting in part. I do not disagree that the general grant of authority contained in RSA 464-A:25, I(d) can be construed to encompass the authority to remove life-sustaining medical treatment in appropriate circumstances, though the trial court's alternative construction is perhaps more understandable when one considers that it was offered in response to a motion to "grant authority to . . . remove life supp[ort]." (Capitalization and bolding omitted; emphasis added.) In addition, I agree that the trial court's statement in its order granting the guardianship that "[t]he guardian does NOT have the authority to remove life sustaining treatment" cannot be read as a limitation imposed pursuant to the court's power under RSA 464-A:25, II. (Bolding omitted.) However, given that the trial court could have limited the guardian's authority to consent to the removal of life-sustaining treatment pursuant to paragraph II, and may well have elected to do so if it had the benefit of the construction of paragraph I(d) that this court has articulated today, I would remand this matter so that the circuit court may have an opportunity to consider whether limiting the guardian's power to consent to the removal of life-sustaining treatment would be "desirable for the best interests of the ward." RSA 464-A:25, II.